761 So.2d 731 (2000)
Arlene Hertzog MAGEE, Individually, and as Natural Tutrix for Mary Ellen Magee and Marsha Danielle Magee; and Ruth Magee Sorrell
v.
Marcus L. PITTMAN, Jr., M.D.
No. 98 CA 1164.
Court of Appeal of Louisiana, First Circuit.
May 12, 2000.
*735 Deborah E. Lavender, New Orleans, for Plaintiffs/Appellants # 1, Arlene Hertzog Magee, Individually, and as Natural Tutrix for Mary Ellen Magee and Marsha Danielle Magee; and Ruth Magee Sorrell.
*736 Milo A. Nickel, Jr., Lake Charles, for Defendant/Appellant # 2, Marcus L. Pittman, Jr., M.D. and Defendant/Appellant # 3, Louisiana Patients' Compensation Fund.
Before: LeBLANC, PETTIGREW, and KLINE,[1] JJ.
KLINE, J. Pro Tempore.
This appeal involves a medical malpractice action. The jury rendered a verdict finding the defendant 20 percent at fault, the plaintiff 20 percent at fault and a nonparty 60 percent at fault. The jury awarded damages for the decedent's survival action and the plaintiffs' wrongful death actions. The plaintiffs filed a motion for an additur, which was granted in part by the trial court. The plaintiffs and defendant both appeal.

BACKGROUND
Dan Magee was a licensed vessel relief captain. On the morning of July 24, 1991, Mr. Magee was aboard a vessel in Houston, Texas, when he began experiencing pains in his chest and arm, and cold sweats. Mr. Magee was immediately taken to the emergency room at Doctors Hospital-East Loop in Houston for evaluation. The admitting diagnosis was to rule out angina in light of the fact that Mr. Magee was only 31 years old, but had suffered from diabetes for over ten years, had a family history of heart disease, and smoked cigarettes regularly. As soon as Mr. Magee's wife, Arlene Magee, learned where Mr. Magee had been taken, she drove from her home in Franklinton, Louisiana to Houston to be with her husband. Mrs. Magee arrived around one o'clock a.m. on July 25, and was allowed to see Mr. Magee for a brief period of time before he was admitted into the hospital.
The physicians attending to Mr. Magee in Houston had several resting EKGs performed on Mr. Magee and ruled out the possibility that Mr. Magee had suffered a heart attack. Thus, on the morning of July 25, Mr. Magee was released from the Houston hospital with a discharge diagnosis of heat stroke. Although Mr. Magee was released to return to work, he was instructed to see his family doctor back home as soon as possible.

FACTS
Pursuant to these instructions, as they approached Baton Rouge, Mr. and Mrs. Magee called defendant, Dr. Marcus L. Pittman, Jr., the doctor whom Mr. Magee had been seeing for about five months for all of his medical treatment except his diabetes. Mr. Magee considered Dr. Pittman as his family physician. Although it would be after five o'clock before Mr. Magee could be in Dr. Pittman's office in Covington, Dr. Pittman agreed to see Mr. Magee that day.
Accordingly, Dr. Pittman saw Mr. Magee late in the afternoon on July 25. At this visit, Dr. Pittman, without taking a thorough history and physical, noted on his chart the complaints Mr. Magee had experienced in Houston, and that according to Mr. Magee, the Houston doctors said his heart was okay. Mr. Magee did not have his medical records from Houston at his visit with Dr. Pittman, and Dr. Pittman's office made only one attempt to procure these records on July 25, which attempt was fruitless. Relying on Mr. Magee's statement that the Houston doctors said his heart was okay, Dr. Pittman instructed Mr. Magee to keep track of his blood sugar levels and to schedule a follow-up appointment with Dr. Pittman for Tuesday, July 30.
The parties dispute what other information, if any, was told by Dr. Pittman to Mr. and Mrs. Magee at this visit on the 25th. According to Mrs. Magee, Dr. Pittman *737 never indicated that he wanted Mr. Magee to go straight to the hospital for further testing and/or to be seen by a cardiologist. Mrs. Magee contends that Dr. Pittman blamed Mr. Magee's diabetes for his pain episode in Houston. According to Mrs. Magee, Dr. Pittman stated that Mr. Magee should "take it easy," and if Mr. Magee had another attack of pain in his chest, he should either call Dr. Pittman or go to the hospital.
Dr. Pittman contends that he was very concerned by the complaints that Mr. Magee presented to him, and that he wanted to hospitalize Mr. Magee immediately. According to Dr. Pittman's trial testimony,[2] Mr. Magee refused to go to the hospital because he had just been released from a Houston hospital where the Houston doctors concluded after testing that his heart was okay. Despite this alleged refusal of medical advice by a patient, the only notation Dr. Pittman made in his chart with respect to this refusal was that patient was told his "heart [was] OK." Also, Dr. Pittman stated that Mr. Magee had a good argument (that the Houston doctors said his heart was okay); thus, he did not feel compelled to fight Mr. Magee on the hospitalization issue. Although Mr. Magee presented complaints that are characteristic of angina, Dr. Pittman did not prescribe any medication to address those complaints because he could not be sure without testing that Mr. Magee was experiencing angina or suffering from coronary artery disease. Accordingly, Dr. Pittman testified that he scheduled Mr. Magee for a follow-up appointment and told Mr. Magee to call at any time and go to the hospital if he suffered any more chest pains.
During the evening of Friday, July 26, Mr. Magee began experiencing more pains in his chest and left arm. Mrs. Magee and Mr. Magee's mother, Ruth Sorrell, gave Mr. Magee one of Ms. Sorrell's nitroglycerine tablets to try to relieve Mr. Magee's pain. Five minutes later, with no success from the first tablet, they gave Mr. Magee a second nitroglycerine tablet. After another five minutes and minimal improvement, Mr. Magee was given a third nitroglycerin tablet and finally received relief from the pain.
The next morning, Mrs. Magee contends that she called Dr. Pittman's answering service to report the pain incident that took place on Friday night. According to Mrs. Magee, when Dr. Pittman returned her call, she told Dr. Pittman that Mr. Magee had suffered more chest pains on Friday night, and he only got relief after taking three nitroglycerin tablets. Ms. Sorrell testified in her deposition taken prior to her death that she was in the room when Mrs. Magee called the answering service and when Dr. Pittman returned the call. Mrs. Magee testified that Dr. Pittman told them to take it easy and call or go to the hospital if Mr. Magee suffered any more attacks; otherwise, he would see Mr. Magee on Tuesday at the regularly scheduled follow-up appointment. At trial, Dr. Pittman denied receiving a phone call from Mrs. Magee on the morning of July 27. He attempted to support this assertion by noting that the phone records from the answering service did not reflect any phone call from Mrs. Magee on the 27th. However, he failed to mention the fact that by the time the phone records were requested from the answering service, the records of the calls had already been erased from the day in question in accordance with company policy.
On Tuesday, July 30, Mr. Magee again saw Dr. Pittman. Mrs. Magee also accompanied Mr. Magee on this visit. What happened at this visit is also disputed. Mrs. Magee contends that they again relayed *738 the Friday night pain episode to Dr. Pittman at the July 30 visit. Also, Mrs. Magee asserts that Dr. Pittman ordered an EKG, but only after demands from Mr. Magee to do so.
Dr. Pittman testified that Mr. Magee did not mention any chest pain episodes at the July 30 visit. Also, Dr. Pittman stated that the EKG was performed at his insistence, not Mr. Magee's, and that he ordered the EKG in an attempt to get Mr. Magee hospitalized. Although Dr. Pittman acknowledged that Mr. Magee went to the hospital for the EKG, he could not explain why he did not order Mr. Magee admitted after undergoing the EKG, if this was his real motive behind ordering the EKG. Instead, Dr. Pittman testified that he planned to tell Mr. Magee to go to the hospital when Dr. Pittman called Mr. Magee with the EKG results. Because Mr. Magee was not home when Dr. Pittman called, and the results of the EKG were normal, Dr. Pittman stated he could not have Mr. Magee hospitalized.
After Mr. Magee underwent the resting EKG, Mr. and Mrs. Magee went home. Early in the afternoon, Mr. Magee went with his brother-in-law, Sammy Tynes, to their deer lease. At the lease property, Sammy planted food plots. Mr. Magee helped by occasionally throwing out handfuls of seed. Mr. Magee's truck got stuck in the mud, but another relative came by with a truck to pull Mr. Magee's truck out of the mud. While Mr. Magee was at the lease property, his sister, Angel, one of his daughters, Mary, and Mrs. Magee arrived with the news that Mr. Magee's EKG had come back normal. Mary rode home with Mr. Magee, while Mrs. Magee followed them. On the way home, Mr. Magee told Mary to clean out his truck because he planned on returning to work since the EKG was normal.
When Mr. Magee arrived at home, he was hungry so Mrs. Magee went to heat dinner. By the time dinner was heated, Mr. Magee was not hungry and began experiencing discomfort in his chest. Quickly thereafter, Mr. Magee had trouble breathing, passed out, and turned blue. Mrs. Magee and Mary tried to administer CPR. As soon as word got out to Sammy and Angel, Sammy arrived and took over the CPR efforts until EMS arrived. EMS transported Mr. Magee to the emergency room where he was pronounced dead at approximately 9:00 p.m. An autopsy that was subsequently performed revealed that Mr. Magee suffered from coronary artery disease, and he died of a heart attack that began four hours before his death.

PROCEDURAL HISTORY
The plaintiffs, Mrs. Magee, individually and as natural tutrix for Mary Ellen Magee and Marsha Danielle Magee (Mr. Magee's daughters), and Ruth Magee Sorrell (Mr. Magee's mother), requested that a medical review panel be formed to consider their claim of malpractice against Dr. Pittman. The panel that considered the claim unanimously found that Dr. Pittman did not breach the standard of care on July 25. However, he did breach the standard of care on Saturday, July 27, when he failed to send Mr. Magee to the hospital after learning of the pains experienced by Mr. Magee on Friday night and the relief obtained from nitroglycerin, which were classic signs of angina. Additionally, the panel concluded that Dr. Pittman breached the standard of care on July 30, when he was again informed of the Friday night pain episode and failed to immediately admit Mr. Magee to the hospital for testing to rule out coronary artery disease.
On June 16, 1994, plaintiffs filed a petition for damages against Dr. Pittman alleging that his negligent departure from the standard of care caused damages to the plaintiffs and Mr. Magee, in that Mr. Magee's fatal heart attack could have been prevented with timely diagnosis and intervention. The plaintiffs asserted a survival action on behalf of Mr. Magee, wrongful death actions on behalf of Mrs. Magee and the daughters, and Lejeune claims on behalf *739 of Mrs. Magee, her daughters and Ms. Sorrell. Dr. Pittman answered the petition, denying the allegations and asserting that the plaintiffs' damages were caused by third parties, as well as by Mr. Magee's own negligence.
A jury trial was held on September 29, 1997. At the conclusion of the trial, the jury returned a verdict finding that Dr. Pittman failed to meet the standard of care in his treatment of Mr. Magee, which failure was a proximate cause of damages to Mr. Magee. The jury assessed 20 percent fault to Dr. Pittman. The jury also found that the Houston physicians breached the standard of care in their treatment of Mr. Magee, which failure was also a proximate cause of damages to Mr. Magee. The jury assessed 60 percent fault to the Houston physicians. Regarding Mr. Magee's comparative fault, the jury found that Mr. Magee contributed to his injury, which fault was a proximate cause of his damages and assessed him with 20 percent fault.
On October 1, 1997, in response to an interrogatory to state what sum of money would reasonably and fairly compensate the plaintiffs for Mr. Magee's physical pain and suffering, mental pain and suffering and loss of chance of survival, "[w]ithout deducting any sums for the percentage of fault, if any, which [the jury] may have assigned to Dan Magee," the jury awarded a total of $15,000, which represented $5,000 for each of these three categories of damages. The jury also awarded Mrs. Magee and her two daughters $89,000 for loss of services and support, nothing for funeral expenses and $2,800 for medical expenses. Mrs. Magee was further awarded $10,000 for loss of love and affection; Marsha Danielle Magee and Mary Ellen Magee were each awarded $20,000 for their respective losses of love and affection. All of the plaintiffs' claims for Lejeune damages were denied.
Also on October 1, after the jury rendered its verdict, was polled and dismissed, the trial court called the attorneys back into court to relay information to the attorneys that it just learned from the jury. According to the transcript of this exchange of information between the trial court and the attorneys, when the trial court went to thank the jury, the jury expressed that "the award they gave was the amount that was already deducted[,]" meaning the jury actually awarded only 20 percent of the damages that they found were suffered by the plaintiffs. Thus, the jury apparently did not follow the jury instruction that said, "without deducting any sums for the percentages of fault ... you may have assigned." The trial court signed a judgment adopting this jury verdict on October 29, 1997.
On October 30, 1997, the plaintiffs filed a motion and order for a judgment notwithstanding the verdict, and/or for additur, and/or for new trial. The bases for these motions were the allegedly erroneous allocation of fault between Mr. Magee, Dr. Pittman and the Houston physicians, and the total damages awarded to the plaintiffs. With respect to the damages, the plaintiffs argued both that the awards given were "woefully inadequate" and that the jury did not follow the instruction that required them to award damages "in toto," without regard to percentages of fault, if any, previously assigned. The minimum amounts that the plaintiffs suggested the trial court should award were more than the amount that the jury intended to award, if, in fact, the amounts actually awarded by the jury represented only 20 percent of the damages the jury found were actually sustained by the plaintiffs. According to the plaintiffs, the awards were inadequate irrespective of the existence of jury error/confusion. Dr. Pittman opposed the plaintiffs' motion.
On March 2, 1998, the trial court signed a judgment denying the motion for judgment notwithstanding the verdict and for new trial, but granting the motion for additur in part. The trial court raised Mrs. Magee's loss of love and affection award from $10,000 to $100,000; raised both of *740 the daughters' loss of love and affection awards from $20,000 each to $100,000 each; awarded funeral expenses in the amount of $5,205; and raised the medical expenses award from $2,800 to $3,586. The judgment specifically provided that "[a]ll other awards stand as given by the jury[,]" and that "the jury's verdict shall stand with regard to the allocation of fault."
Both parties appealed from the March 2, 1998 trial court judgment. The plaintiffs asserted the following six assignments of error:
1. The jury erred in its allocation of fault, i.e., 60 percent to a Houston physician, 20 percent to defendant[,] Dr. Pittman, and 20 percent to decedent.
2. The jury erred in its calculation of damages.
3. The jury erred by failing to award Lejeune damages.
4. The judge erred in his decision to correct only a part of the jury verdict, i.e., the wrongful death awards, funeral expenses and medical expenses, and leaving uncorrected the balance of the verdict.
5. The judge erred in the amount awarded by additur, as the amount given by him to the widow and daughters of Dan Magee was woefully inadequate to compensate these particular plaintiffs for their particular losses.
6. The judge erred in his decision to prevent questioning by plaintiffs regarding the "informed consent" issue at trial, after the defendant raised the issue of contributory negligence on the part of decedent, and thereby placed the question at issue.
Dr. Pittman, in his appeal, asserted the following four assignments of error:
1. The Trial Court erred in failing to grant defendant's Motion in Limine to Strike the Testimony of plaintiffs' expert witness, Dr. Samuel George.
2. The Trial Court erred in granting plaintiff's Motion for Additur.
3. The jury erred in allocating any percentage of fault to Dr. Pittman.
4. The jury improperly considered the source of the payment of any verdict that might be rendered.

QUALIFICATION OF PLAINTIFFS' EXPERT TO TESTIFY

(Dr. Pittman's Assignment of Error No. 1)
Through this assignment of error, Dr. Pittman contends that the trial court erred in failing to grant his motion in liminie to strike the testimony of the plaintiffs' expert witness, Dr. Samuel George.[3] Dr. Pittman bases this contention on the operation of the locality rule.
The locality rule applies solely to non-specialists and requires that the degree of care to which the physician is to be held be based upon the standard of practice in a similar community or locale and under similar circumstances. LSA-R.S. 9:2794A(1). Specialists are held to a national standard, that degree of care ordinarily practiced by physicians within the involved medical specialty. Because Dr. Pittman has not limited his practice to the specialized field of cardiology, nor held himself out as a specialist in treating cardiac patients, we agree that the locality rule rather than a national standard applies. See Rowsey v. Jones, 26,823, p. 19 (La. App. 2nd Cir.5/10/95), 655 So.2d 560, 573.
Under LSA-R.S. 9:2794, an expert must possess the requisite knowledge about the applicable standard of care. A specialist may testify as an expert witness in a case involving a general practitioner if *741 he has sufficient knowledge of the requisite subject matter. McLean v. Hunter, 495 So.2d 1298, 1302 (La.1986). The expert must also be familiar with the standard required of a physician under similar circumstances and in a similar community. Rowsey, 655 So.2d at 573-74. The only jurisprudential exception to the locality rule eliminating the "similar community" requirement is where a uniform nationwide method for a particular medical procedure has been established. Piazza v. Behrman Chiropractic Clinic, Inc., 601 So.2d 1378, 1381-82 (La.1992). Outside of this exception, an expert must be familiar with the degree of care ordinarily exercised by physicians in a similar community or locale and under similar circumstances. LSA-R.S. 9:2794. Rowsey, 655 So.2d at 574. Absent an abuse of discretion by the trial court, we may not disturb a trial court's ruling on the qualification of an expert witness. Maxwell v. State, Department of Transportation and Development, 391 So.2d 1230, 1233 (La.App. 1st Cir.), writ denied, 394 So.2d 281 (La.1980).
Because Dr. George is a cardiologist, affiliated with Duke University in North Carolina, and did not go to medical school or practice medicine in Louisiana, Dr. Pittman asserts that Dr. George should not have been allowed to testify. However, this argument ignores the fact that the locality rule does not prevent testimony from an out-of-town specialist with respect to the local standard of care owed by a general practitioner where it is demonstrated to the court that the witness practices in a similar community or has knowledge of the standard of care exercised in the same or a similar community. Hence, the expert need not have practiced in the community of the defendant to be qualified as an expert witness on the standard of care.
Dr. George testified that he is a cardiologist who practices in Durham, North Caroline at Duke University and the Durham VA Hospital. In his position, he deals regularly with physicians who practice general medicine. Additionally, he frequently treats referral patients, which means he is on the phone with general practitioners throughout the United States, particularly from small emergency rooms, and with small-town family physicians who have patients suffering from chest pain. Dr. George stated that he is familiar with the standard of care for general practitioners in the treatment of chest pain. Dr. George also attends nationwide meetings regarding chest pain management and reads literature regarding the management of chest pain in community hospitals. Dr. George expressly noted his familiarity with the degree of knowledge or skill that should be possessed and exercised by Louisiana licensed practitioners in the general practice of medicine regarding the referral and treatment of patients with chest pain. Finally, Dr. George testified that with basic things like chest pain, the standard of care for a general or family practitioner is the same as for a specialist, and one can expect the same minimal level of knowledge by all physicians regarding symptoms of coronary disease or angina. Thus, the standard of care for the recognition, diagnosis and institution of therapy for coronary artery disease cuts across a broad range of specialties.
Moreover, two members of the medical review panel, Sister Mary Baudier, M.D.[4] and Dr. Roy Montalbano,[5] testified that the standard of care for some basic things, like the complaints expressed by Mr. Magee to Dr. Pittman, is the same whether the treating physician is a specialist or a general practitioner.
In light of this testimony, there is ample support for the conclusion by the trial court that Dr. George satisfied the locality rule, as well as that there was a uniform *742 nationwide method for the recognition, diagnosis and institution of medical therapy for coronary disease, thereby constituting an exception to the locality rule. Under either conclusion, we cannot say that the trial court abused its discretion in allowing Dr. George to testify at the trial. This assignment of error lacks merit.

EXCLUSION OF EVIDENCE ON ISSUE OF INFORMED CONSENT

(Plaintiffs' Assignment of Error No. 6)
In this assignment of error, the plaintiffs contend that the trial court erred by not allowing them to question witnesses on the issue of informed consent on the ground that informed consent was not alleged in the pleadings. The trial court made these rulings during the testimony of Dr. Pittman and Dr. Roy Montalbano, the only member of the medical review panel to be called as a witness by Dr. Pittman. During the cross-examination of both of these witnesses, plaintiffs' counsel inquired about what Dr. Pittman should have told Mr. Magee about the risks of not being hospitalized. Dr. Pittman objected to the line of questioning, and the objections were sustained, thereby precluding the plaintiffs from exploring this issue. However, we note that the plaintiffs failed to proffer the excluded testimony. The purpose of a proffer is to preserve excluded testimony for appellate review. The plaintiffs' failure to proffer the evidence of informed consent precludes them from complaining of the exclusion on appeal. Scurto v. Siegrist, 598 So.2d 507, 510 (La.App. 1st Cir.), writ denied, 600 So.2d 683 (La.1992). Accordingly, this assignment of error is meritless.

ALLOCATION OF FAULT

(Plaintiffs Assignment of Error No. 1 and Dr. Pittman's Assignment of Error No. 3)
Both plaintiffs and Dr. Pittman contest the jury's allocations of fault. Plaintiffs contend that Mr. Magee and the Houston physicians were allocated too much fault, and that not enough fault was allocated to Dr. Pittman. Whereas, Dr. Pittman asserts that the jury erred in allocating any fault to him.
The review of an allocation of comparative fault is governed by the standard set forth in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). The assessment of percentages of fault is a factual determination. Clement v. Frey, 95-1119, 95-1163, pp. 5-7 (La.1/16/96), 666 So.2d 607, 609-10. Thus, in reviewing a jury's assessment of percentages of fault, we must keep in mind that the fact finder has a duty to assess the demeanor and credibility of all witnesses, lay and expert. A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Clement, 666 So.2d at 609-10. Only after making the finding that the record supports that the lower court was clearly wrong in its apportionment of fault can the appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Clement, 666 So.2d at 611.

Allocation of Fault to Mr. Magee
After a thorough review of the record, we cannot say the jury was clearly wrong in allocating 20 percent fault to Mr. Magee. The evidence reveals that Mr. Magee smoked cigarettes regularly, and that smoking is a risk factor of coronary artery disease. Additionally, there was testimony that Mr. Magee should have called Dr. Pittman on Friday night during his chest pain spell. The jury could have inferred that if Mr. Magee had called during the Friday night pain episode, Dr. *743 Pittman may have sent him to the hospital. Additionally, Mr. Magee's sister, Angel Tynes, testified that Mr. Magee began feeling bad at the hunting camp, rather than once he got home that evening. Thus, the jury could have found that Mr. Magee should have gone to the hospital from the hunting camp, thereby increasing the chance of surviving the heart attack that was beginning according to the autopsy report. In light of our review of the entire record, we cannot say the jury was clearly wrong in finding that Mr. Magee was 20 percent at fault for his death.

Allocation of Fault to Dr. Pittman and the Houston Physicians
The plaintiffs contend that the jury did not allocate enough fault to Dr. Pittman, and that it allocated too much fault to the Houston physicians. Dr. Pittman argues that he should not have been allocated any fault. After a thorough review of the record, we find that the jury was not clearly wrong in allocating fault to Dr. Pittman. Additionally, we find that the evidence does not support a finding that the fault of the Houston physicians was three times greater than the fault of Dr. Pittman. Accordingly, we will adjust the allocation of fault between Dr. Pittman and the Houston physicians.
Dr. George testified that the Houston physicians made a misdiagnosis of heatstroke when Mr. Magee was discharged on July 25. He also opined that the diagnosis of unstable angina should have been apparent to the Houston physicians based on Mr. Magee's symptoms upon admission to the emergency room. He isolated the mistake made by the Houston physicians as the failure to get intense medical therapy for Mr. Magee upon presentment of signs of unstable angina. However, according to Dr. George, this failure by the Houston physicians did not lessen Dr. Pittman's independent duty to diagnose and institute proper treatment for Mr. Magee's unstable angina and coronary heart disease. Specifically, Dr. George testified that even without information from Houston, there was enough information in Mr. Magee's records to be acutely concerned and realize the need to intervene quickly. Also, Dr. George stated that it does not meet the standard of care to rely on a patient's statement that another doctor has said the patient is okay. Life-threatering conditions and diseases such as unstable angina and coronary artery disease must be investigated further.
Dr. George relied on Dr. Pittman's statements and deposition testimony that Mr. Magee's symptoms caused him great concern from a cardiac standpoint to conclude that Dr. Pittman did not act properly on this observation. In Dr. George's opinion, Dr. Pittman should have hospitalized Mr. Magee as soon as possible, and with early hospitalization, even as early as the afternoon of July 30, there would have been time to intervene and prevent Mr. Magee's fatal heart attack. Thus, Dr. George concluded that Dr. Pittman breached the standard of care of a general practitioner on July 25, 27 and 30.
Neither Dr. Kevin Russ nor Sister Mary Baudier rendered an opinion on whether the Houston physicians breached the standard of care with respect to their diagnosis and treatment of Mr. Magee. Sister Baudier acknowledged that Dr. Pittman should have followed up the Houston diagnosis, in addition to following up any new complaints expressed by the patient. Both Dr. Russ and Sister Baudier opined that Dr. Pittman breached the standard of care on July 27 and July 30 when he failed to hospitalize Mr. Magee after learning of the chest pains suffered by Mr. Magee on July 26, and the relief Mr. Magee obtained from nitroglycerine tablets.
Dr. Montalbano was the third member of the medical review panel, and the only member to change his opinion from the time of the panel's decision to the time of trial.[6] While Dr. Montalbano was testifying *744 as a witness for Dr. Pittman, he opined that the Houston diagnosis of heatstroke was unsupported, and that the Houston physicians did not address the issue of unstable angina. Other than this limited testimony, Dr. Montalbano made no conclusion regarding the fault of the Houston physicians. He made it clear that his opinion that Dr. Pittman did not breach the standard of care was based on a credibility determination that Dr. Pittman's assertions were truthful, and to the extent Mrs. Magee's factual testimony conflicted with Dr. Pittman's, Mrs. Magee was either untruthful or mistaken. Dr. Montalbano also agreed that once Dr. Pittman accepted Mr. Magee as a patient on July 25, he became Mr. Magee's doctor and had the responsibility of evaluating Mr. Magee's complaints of chest pain.
Dr. Pittman testified on his own behalf. At the trial, Dr. Pittman opined that the Houston physicians' period of hospitalization of Mr. Magee was very short and left some question, which is why he wanted to put Mr. Magee back in the hospital on July 25. He also thought the diagnosis in Houston was wrong and that the misdiagnosis complicated his treatment of Mr. Magee. However, Dr. Pittman agreed he had the responsibility of evaluating Mr. Magee's new complaints of one-day-old chest pain. He stated that he did not do a thorough history and physical of Mr. Magee in the office because these are things he does at the hospital, and that Mr. Magee had refused to comply with Dr. Pittman's orders to go to the hospital on July 25.
On cross-examination, Dr. Pittman was confronted with the fact that his narrative submitted to the medical review panel listed diabetes as the primary concern; did not mention any cardiac condition of Mr. Magee or Dr. Pittman's unsuccessful efforts to hospitalize Mr. Magee on July 25; and lacked any reference to the fact that Mr. Magee refused Dr. Pittman's orders to be hospitalized. Dr. Pittman also acknowledged that regardless of whether the Houston doctor made a mistake, Dr. Pittman was Mr. Magee's doctor on July 25. Dr. Pittman was also confronted with his prior deposition testimony wherein he stated that he "wouldn't say [Mr. Magee's] treatment ... in Houston caused the damages. It [was] very bad that he was not able to be held over a longer period [in Houston]." At trial, it was his opinion that the lack of a proper diagnosis in Houston could have contributed to Mr. Magee's early death, and that the lack of treatment by further observation by the Houston physicians resulted in Mr. Magee's premature death. However, Dr. Pittman admitted he was not blaming the Houston physicians for his failure to refer Mr. Magee to a cardiologist, take a history and physical, and get Mr. Magee into the hospital.
Based on this evidence, there is no reasonable basis for a conclusion by the jury that the fault of the Houston physicians was three times greater than the fault of Dr. Pittman. It was undisputed that the general rule is that a patient with the symptoms presented by Mr. Magee has coronary artery disease until it is ruled out. In light of the jury's verdict that Dr. Pittman breached the standard of care and such breach was a proximate cause of the plaintiffs' damages, the jury must have believed that Mrs. Magee told Dr. Pittman about the Friday night pain episode, and that Dr. Pittman should have diagnosed Mr. Magee with unstable angina and admitted Mr. Magee to the hospital for intensive therapy and testing. Despite the testimony that the Houston physicians missed the diagnosis of unstable angina, *745 the testimony was clear that Dr. Pittman had the opportunity and should have diagnosed Mr. Magee with unstable angina, at least by July 27. Thus, the Houston physicians and Dr. Pittman had the same duties with respect to the diagnosis and treatment of Mr. Mageeinstitute immediate therapy or refer him to a specialist.
In light of the entire record, it is clear that the basis of fault for the Houston physicians was the same as the basis of fault for Dr. Pittmanthe failure to diagnose and obtain proper treatment for Mr. Magee. Namely, Dr. Pittman was found to have breached the standard of care by not recognizing Mr. Magee's symptoms as characteristic or indicative of coronary artery disease, and thereby not putting Mr. Magee in a hospital or referring him to a cardiologist for further evaluation.
Additionally, there was testimony that Dr. Pittman had an independent duty to examine Mr. Magee, irrespective of the results reached by the Houston physicians, and that Dr. Pittman had the last chance to diagnose Mr. Magee with unstable angina and coronary artery disease. Accordingly, we find that the least amount of fault that the jury could reasonably have allocated to Dr. Pittman was 40 percent, and the most that could have been allocated to the Houston physicians was 40 percent. Even though we may feel that Dr. Pittman's fault was greater than that of the Houston physicians, the most we can allocate to Dr. Pittman on appeal is 40 percent. See Clement, 666 So.2d at 611. For these reasons, the fault is reallocated to assess Dr. Pittman with 40 percent and the Houston physicians with 40 percent. The allocation of 20 percent fault to Mr. Magee remains unchanged.

PROPRIETY OF ADDITUR

(Dr. Pittman's Assignment of Error No. 2)
In his second assignment of error, Dr. Pittman asserts that the trial court improperly granted an additur. In arguing that the trial court's partial additur was improperly granted, Dr. Pittman contends that the plaintiffs sought an additur solely on the ground that the jury was confused and performed its own reduction of the damage awards to arrive at the figures listed on the jury interrogatory form. Because the law does not permit inquiry into the thought processes by which a jury reaches a verdict, Dr. Pittman contends that the trial court improperly granted the additur on this basis. Alternatively, Dr. Pittman argues that the additur was not properly granted because an additur is a substitute for a new trial, and a new trial would not have been proper under the circumstances.
With respect to Dr. Pittman's first argument, our review of the plaintiffs' motion for judgment notwithstanding the verdict, additur, and new trial reveals that it was based on more than the mere allegation of jury error/confusion. One basis for the motion was that the jury's allocation of fault among Mr. Magee, Dr. Pittman, and the Houston physicians was erroneous. Another basis was that the total damage awards were not supported by the jurisprudence and were woefully inadequate. Thus, even excluding the assertion of jury confusion, the plaintiffs asserted that the awards given by the jury were inadequate, thereby necessitating a judgment notwithstanding the verdict, an additur or a motion for new trial to correct the inadequacy. Moreover, in their supporting memorandum, the minimum amount that the plaintiffs contended that they were entitled to receive exceeded the amounts the jury allegedly would have awarded were it not for jury confusion.
The trial court specifically granted an additur with respect to certain elements of the damage award. In doing so, the trial court raised the damages awarded to Mrs. Magee for her loss of love and affection from $10,000 to $100,000; raised the loss of love and affection damages awarded to Marsha Magee from $20,000 to $100,000; raised the loss of love and affection damages awarded to Mary Ellen Magee from *746 $20,000 to $100,000; added an award of funeral expenses in the amount of $5,205; and raised the award for medical expenses from $2,800 to $3,586, representing an additional $819 for the ambulance service from Mr. Magee's home to the hospital. The trial court ordered that the allocations of fault would stand and specifically denied the motion for judgment notwithstanding the verdict and the motion for new trial.
Thus, it is apparent that the trial court did not base its granting of the plaintiffs' motion for an additur on the alleged jury confusion. If it had, the award to Mrs. Magee would have only been increased to $50,000, rather than to $100,000; and the medical expenses would have been raised to a higher amount. Instead, the trial court believed that the jury's damage awards for the above-referenced categories were sufficiently low, so as to warrant an additur. Thus, we must determine whether the prerequisites to granting an additur were satisfied in this case. If the prerequisites for granting an additur were met, we must review the jury's award for abuse of discretion. If the jury's award is within the range of discretion, an additur is not proper. LSA-C.C.P. art. 2083B. Accardo v. Cenac, 97-2320, p. 9 (La.App. 1st Cir.11/6/98), 722 So.2d 302, 307.
Louisiana Code of Civil Procedure article 1814 provides as follows:
If the trial court is of the opinion that the verdict is so ... inadequate that a new trial should be granted for that reason only, it may indicate to the party or his attorney within what time he may enter a[n] ... additur. This ... additur is to be entered only with the consent of the ... defendant ... as an alternative to a new trial, and is to be entered only if the issue of quantum is clearly and fairly separable from other issues in the case.
An additur is to be used as an alternative to the grant of a motion for new trial. See Accardo, 722 So.2d at 306. Thus, the propriety of an additur depends on whether it would have been proper to grant a new trial. See Fleming v. Smith, 93-488, p. 8 (La.App. 5th Cir.5/31/94), 638 So.2d 467, 472. Two articles govern the circumstances under which a new trial should and can be granted. Louisiana Code of Civil Procedure article 1972 provides peremptory grounds for granting a new trial, one of which is when the verdict or judgment appears clearly contrary to the law and evidence. Article 1973 gives the trial court discretion to grant a new trial "in any case if there is good ground therefor."
Louisiana jurisprudence is clear that a new trial should be ordered when the trial court, exercising its discretion, is convinced by its examination of the facts that the judgment would result in a miscarriage of justice. Perkins v. K-Mart Corporation, 94-2065, p. 9 (La.App. 1st Cir.6/23/95), 657 So.2d 725, 731, writ denied, 95-2058 (La.11/13/95), 662 So.2d 477. New trials can also be granted on issues of quantum. See Guillory v. National Union Fire Insurance Company, 95-1132, pp. 3-4 (La.App. 3rd Cir.1/31/96), 670 So.2d 326, 328; Fleming, 638 So.2d at 472; Kaplan v. Missouri-Pacific Railroad Company, 409 So.2d 298, 301, n. 1 (La.App. 3rd Cir.1981).
Although the granting of a new trial under Article 1972 is mandatory under those circumstances, the jurisprudence interpreting the provision recognizes the trial court's discretion in determining whether the verdict is contrary to the law and evidence. Zatarain v. WDSU Television, Inc., 95-2600, p. 3 (La.App. 4th Cir.4/24/96), 673 So.2d 1181, 1183. The grant or denial of a new trial under Article 1973 should not be reversed unless there has been an abuse of the trial court's discretion. Perkins, 657 So.2d at 731. Thus, the standard of review for the grant or denial of a new trial under Articles 1972 and 1973 is the sameabuse of discretion. Zatarain, 673 So.2d at 1183; Perkins, 657 So.2d at 731.
*747 In the present case, the trial court found that the damages awarded to the plaintiffs were inadequate in some respects. Thus, the trial court raised the jury's awards for these elements of damages. The jury awarded $20,000 in damages to each of Mr. Magee's two daughters for their loss of love and affection. We agree with the trial court that these awards were abusively low. These two girls lost their father while they were seven and twelve years old. The testimony evidences a close familial relationship between the girls and their father, who was only thirty-one years old at the time of his death.
Mary was twelve years old when her father died. She testified that her father was a good man and treated them like gold. He did whatever it took to get whatever his family needed. According to Mary, Mr. Magee's family was his world. They would go camping together, boating on the river and spend time at the hunting lease together. Mary testified that it has been hard without her father; she has had to grow up fast to fill his shoes. Mary noted that there was a lot of love between her father and both she and Marsha, and that she will never be over losing her father.
Marsha, who was seven years old when her dad died, testified that her dad "spoiled her rotten." At the time of trial, she still spoke about missing doing things with her dad. School is upsetting because other children always talk about the things they do with their dads and ask her if she went certain places with her dad. Marsha said it is hard because she no longer has a real daddy.
Clearly, an award of only $20,000 under these circumstances was an abuse of the jury's discretion, such that the trial court was proper to conclude that a new trial was warranted with respect to these elements of the damage award.
The jury awarded Mrs. Magee $10,000 for her loss of love and affection, and we agree with the trial court that this amount was abusively low. Mr. and Mrs. Magee met when she was eighteen years old and Mr. Magee was seventeen years old. They were married approximately one year later, in 1978; thus, they had been married almost thirteen years at the time of his death. Mr. and Mrs. Magee had a very loving and supportive relationship. Mrs. Magee had stood by Mr. Magee through the difficult times, such as when he was diagnosed with diabetes only a year after they were married. Mrs. Magee also helped Mr. Magee study so that he could pass the tests to obtain his pilot's/captain's license and his tankerman's ticket. When she was told that her husband had died, Mrs. Magee's "heart felt like it had a hole in it that big, just empty." She testified that it is still that way because her "companion left [her]." In light of this testimony, we cannot say that the trial court abused its discretion in deciding that a new trial was proper with respect to this element of damages.
The jury awarded $2,800 in medical expenses and did not award anything for funeral expenses. The trial court raised the medical expenses award to $3,586, and awarded $5,205 for funeral expenses. We cannot say the trial court abused its discretion in finding a new trial was proper to increase the award of medical expenses and to add an award for funeral expenses. These amounts were clearly evidenced at trial and were not contradicted. The medical expenses that were established at trial totaled $3,586.35, yet the jury only awarded $2,800. The evidence clearly established that the plaintiffs incurred $5,205 in funeral expenses. Dr. Pittman did not contest these amounts. There is no plausible explanation for this reduced amount of medical expenses awarded by the jury to the plaintiffs or the jury's failure to award funeral expenses. Thus, the trial court did not abuse its discretion in finding that the law and evidence did not support these parts of the verdict. See Fleming, 638 So.2d at 472.
*748 We also reject Dr. Pittman's argument that an additur was not proper because the issues of liability and quantum were not fairly separable. In support of this argument, Dr. Pittman asserts that the low damages awarded by the jury could have been indicative of an implicit finding that the decedent would have died even without any breach of the standard of care by Dr. Pittman or the Houston physicians. We disagree. The jury interrogatories do not support this contention. Had the jury found that Mr. Magee would have died even if Dr. Pittman had met the standard of care, it would have found that Dr. Pittman's actions were not a proximate cause of Mr. Magee's death, or it would have allocated a much greater portion of the fault to Mr. Magee. Moreover, the jury interrogatories did not question whether Mr. Magee would have died anyway. The interrogatories were clear; the jury concluded that Dr. Pittman's breach of the standard of care in his treatment of Mr. Magee was a proximate cause of Mr. Magee's death. It then awarded damages as a result of the breach by Dr. Pittman. These issues were adequately separable and thus, this requirement of an additur was satisfied. See Smith v. Louisiana Health and Human Resources Administration, 93-1434, pp. 21-23 (La.App. 4th Cir.5/18/94), 637 So.2d 1177, 1192-93, writ denied, 94-1617 (La.10/7/94), 644 So.2d 634; Lougon v. Era Aviation, Inc., 609 So.2d 330, 340-41 (La.App. 3rd Cir.1992). Thus, we are not persuaded by this argument.

ADEQUACY OF ADDITUR

(Plaintiffs' Assignment of Error No. 5)
Having found that the additur was properly granted, we must now consider the adequacy of the additur, as plaintiffs contend that the amounts awarded by the additur for loss of love and affection were inadequate. We note that in granting an additur, the trial court is relegated to raising the awards to the lowest amount that is supported by the jurisprudence. See Accardo, 722 So.2d at 308; Jeansonne v. Detillier, 94-903, p. 9 (La.App. 5th Cir.5/10/95), 656 So.2d 689, 693, writ denied, 95-1410 (La.9/22/95), 660 So.2d 471.
After a thorough review of the record, we cannot say that the trial court abused its discretion in increasing the awards to Mrs. Magee, Mary and Marsha for loss of love and affection to $100,000 each. While this amount is on the low end of the range, this is what the trial court was mandated to do in granting the additurraise the jury's award to the lowest amount that is supported by the jurisprudence. See Accardo, 722 So.2d at 308. Accordingly, this assignment of error is without merit.

AWARDS FOR SURVIVAL ACTION AND LOSS OF SERVICES AND SUPPORT

(Plaintiffs' Assignments of Error Nos. 2 and 4)
The plaintiffs assign error to the trial court's failure to grant an additur with respect to the jury's awards to Mrs. Magee, Marsha and Mary for loss of services and support, and the jury's award to the plaintiffs for Mr. Magee's survival action. Alternatively, the plaintiffs contend that jury erred in its calculation of damages. As previously stated, the appellate court should review the jury's award for abuse of discretion, and the trial court abuses its discretion in granting an additur when the jury's award is within the range of its discretion. Accardo, 722 So.2d at 307. Thus, in deciding whether the trial court erred in failing to grant an additur with respect to the loss of services and support and survival action awards, we will necessarily determine the adequacy of the jury's awards for these elements of damages.

Loss of Services and Support
The wrongful death action includes damages to the survivor(s) for loss of love and affection, loss of services, and loss of support. An award for loss of support includes the loss of past support *749 from the date of death to the date of trial and loss of future support from the date of trial through the duration of the decedent's work-life expectancy. Easton v. Chevron Industries, Inc., 602 So.2d 1032, 1038-39 (La.App. 4th Cir.), writs denied, 605 So.2d 1315, 1318 (La.1992).
Awards for future lost income are inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty, thus the courts must exercise sound judicial discretion to determine these awards. The awards should be consistent with the record and not work a hardship upon either party. Factors to be considered in determining a proper award for lost future income are the decedent's physical condition before his death, the decedent's past work history and consistency thereof, the amount the decedent probably would have earned absent the death, and the probability that the decedent would have continued to earn wages over the remainder of his working life. See Robbins v. State, Department of Labor, 31,590, p. 8 (La.App. 2nd Cir.2/24/99), 728 So.2d 991, 996-97.
Service is the compensated work around the house or educational help with the children which will have to be obtained from another source and at a price because of the death of the provider. The loss of services element in the wrongful death action is an item of special damage that requires some measurable proof, more than a showing of potential loss, of the value or replacement cost of the services. If claimed separately, this item must be distinguished from the other elements of wrongful death damage, such as the loss of a decedent's love and affection, companionship, attention to routine physical and mental comfort, and earnings and support. Dixon v. Mid-South Rail Corporation, 580 So.2d 438, 444 (La.App. 2nd Cir.), writ denied, 584 So.2d 1160 (La. 1991). Thus, when the loss of a loved one's services is claimed as a material, compensable loss, there must be some evidentiary basis to allow the trier of fact and the appellate court to reasonably evaluate or measure in money the claimed material loss. The loss of material services is susceptible of reasonably certain proof. Dixon, 580 So.2d at 444-45.
Dan Cliffe, a certified public accountant, testified for the plaintiffs as an expert in economic analysis and determination of economic losses. According to Mr. Cliffe, he calculated two separate sets of figures, based on different life expectancies. In the first set of figures, Mr. Cliffe assumed a normal work-life expectancy of 20.7 years at the time of trial to arrive at the past and future wages Mr. Magee would have earned had he been promoted to captain, and he also calculated the past and future wages Mr. Magee would have earned had he remained a relief captain with a normal work-life expectancy of 20.7 years. Based on these assumptions, and applying a personal consumption discount and a 6.5 percent discount rate to arrive at the present value of those earnings, Mr. Cliffe opined that as a full captain, Mr. Magee's past wage loss would be $177,290 and his future wage loss would be $466,280 (a total of $643,570). As a relief captain, Mr. Magee's past lost wages would be $170,270, and his future lost wages would be $435,655 (a total of $605,925).
Assuming that Mr. Magee would only live to age 50, resulting in a shorter 12.6year work-life span at the time of trial, Mr. Cliffe determined that Mr. Magee would have earned $177,290 in past lost wages and $296,070 in future lost wages (a total of $473,360) if he worked as a full captain. If Mr. Magee was only a relief captain with the shortened work-life span, his past lost wages would be $170,270 and his future lost wages would be $274,715 (a total of $444,985). Thus, the total range of figures calculated by Mr. Cliffe for past and future wage loss was $444,985 to $643,570.
Rather than call an economist to contradict these calculations, Dr. Pittman attempted to undermine the validity of Mr. Cliffe's lost wage figures by identifying *750 factors that were not considered by Mr. Cliffe. On cross-examination, Mr. Cliffe acknowledged that he did not directly account for any period of unemployment for illness, surgery recuperation, or job changes. Instead, Mr. Cliffe indirectly accounted for these periods by obtaining Mr. Magee's past earnings from his prior W-2 forms and income tax returns. In this way, the salary figures represented any lost earnings from time off of work. Mr. Cliffe also acknowledged that he did not consider the physical requirements of being a full captain, and that he had no medical basis to assume that Mr. Magee would be able to continue working as a relief or full captain after undergoing open-heart surgery. However, Dr. Pittman did not present any evidence that these assumptions by Mr. Cliffe were faulty. Mr. Cliffe also acknowledged that if Mr. Magee did not have insurance to cover his insulin injections and the costs associated with other medical conditions and procedures, the personal consumption discount would be higher than the one he applied. But again, Dr. Pittman failed to present evidence that these items would not have been covered by health insurance.
We note there was no expert testimony regarding the value of services to the household lost through the death of Mr. Magee. Nor was there any specific testimony from the plaintiffs regarding chores or household services that were performed by Mr. Magee prior to his death.
Thus, in light of the compelling and effectively uncontradicted testimony and calculations provided by Mr. Cliffe that Mr. Magee's past and future lost wages were at least $444,985, we find that the jury's award of $89,000 was abusively low. Even if the jury believed the figures reached by Mr. Cliffe should have been discounted further, there was no evidence provided by Dr. Pittman to arrive at a lower figure. Thus, we find that the trial court should have granted an additur to raise the award for loss of services and support. Because the record before us on this issue is complete, we will amend the judgment to award the plaintiffs the lowest amount reasonably within the jury's discretion with respect to an award for loss of services and support. See Morgan v. Belanger, 633 So.2d 173, 174 (La.App. 1st Cir.1993), writ denied, 93-3121 (La.2/11/94), 634 So.2d 832. We find this amount to be $444,985. Thus, the award for loss of services and support is raised from $89,000 to $444,985.

Mr. Magee's Survival Action
The plaintiffs also contend that the $15,000 they received for the survival action of Mr. Magee was too low and should have been raised by the trial court through the additur. A court may award damages for the pain and suffering of the decedent where there is the smallest evidence of pain on the part of the victim, by his actions or otherwise. Gordon v. Willis Knighton Medical Center, 27,044 (La.App. 2nd Cir.6/21/95), 661 So.2d 991, 1001, writs denied, 95-2776, 95-2783 (La.1/26/96), 666 So.2d 679. However, like other general damage awards, the amount awarded is subject to the vast discretion of the jury. Hayes v. City of Baton Rouge/Parish of East Baton Rouge, 96-0189, p. 10 (La.App. 1st Cir.11/8/96), 683 So.2d 899, 904-05, writ denied, 96-2940 (La.2/21/97), 688 So.2d 532. In the present case, we cannot say that the jury abused its discretion in awarding $15,000 in survival action damages. See Clark v. Baton Rouge General Medical Center, 94-2239, p. 13 (La.App. 1st Cir.6/23/95), 657 So.2d 741, 749-50, writs denied, 95-1911, 95-1794 (La.10/27/95), 661 So.2d 1347, 1352; Archie v. Board of Supervisors of Louisiana State University, 543 So.2d 1348, 1350-51 (La. App. 1st Cir.1989). Thus, the trial court did not err in refusing to grant an additur with respect to this element of damages.

JURY'S FAILURE TO AWARD LEJEUNE DAMAGES

(Plaintiffs' Assignment of Error No. 3)
The plaintiffs also contend that the jury erred by failing to award Lejeune damages. *751 The plaintiffs, including Mr. Magee's mother, Ruth Sorrells, argue that they were entitled to Lejeune damages because they witnessed Mr. Magee suffer a heart attack and die. The jury obviously found differently, awarding nothing for Lejeune damages.
A cause of action for the emotional distress and mental anguish suffered by a bystander who witnesses injury to another person or comes upon the scene soon thereafter was recognized in this state by our Louisiana Supreme Court in Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). The legislature enacted LSA-C.C. art. 2315.6 in 1991, in response to the Lejeune decision and codified the test for recovery that was pronounced in Lejeune. Wartelle v. Women's and Children's Hospital, Inc., 97-0744, pp. 12-13 (La.12/2/97), 704 So.2d 778, 785. Under Article 2315.6, there are four basic requirements to recover damages for mental anguish or emotional distress suffered as a result of another person's injury. The requirements are as follows: 1) the claimant must have a specifically enumerated relationship with the injured person; 2) the claimant must have viewed an event causing injury to the injured person or have come upon the scene of the event soon thereafter; 3) the harm to the injured person must have been severe enough that one could reasonably expect the observer to suffer serious mental distress; and 4) the claimant must suffer emotional distress that is "severe, debilitating, and foreseeable." Trahan v. McManus, 97-1224, p. 8, n. 6 (La.3/2/99), 728 So.2d 1273, 1278, n. 6.
Pursuant to the language of LSA-C.C. art. 2315.6, a spouse, child and parent are clearly among those persons with a sufficient relationship to enable recovery of Lejeune damages. Resolution of the issue of whether an omission by a doctor in treatment or diagnosis of a patient is an injury-causing event is not as clear. In Trahan, 728 So.2d at 1275, the defendant was an emergency room doctor who mistakenly read the wrong chart in assessing the condition of an automobile accident victim. Thus, the defendant failed to detect that the victim was in shock and was bleeding internally. The defendant discharged the victim in the presence of his mother, and the victim died shortly thereafter in the presence of both his mother and father. The mother and father sought Lejeune damages arising out of the misdiagnosis and death of their son. In considering the second element of recovery of Lejeune damages, the Louisiana Supreme Court stated as follows:
[W]hen the event is a negligent omission by the tortfeasor, such as frequently occurs in medical malpractice cases, the applicability of Article 2315.6 becomes more problematic for recovery of damages for mental distress resulting from observing an injury-causing event or arriving on the scene of the injury soon after the event while the victim is still in the condition, caused by the event, that creates emotional distress in the observer.
A historical review of cases allowing recovery of bystander damages shows that bystander damages are intended to provide a remedy when severe mental distress arises directly and immediately from the claimant's observing a traumatic injury-causing event to the direct victim. In order to recover, the claimant who observes the injury-causing event (or soon thereafter comes upon the scene of the injury) must be contemporaneously aware that the event has caused harm to the direct victim. The requirement of temporal proximity has always been at the root of allowing recovery for emotional distress caused by an injury to another.... Recovery of damages for mental anguish has almost never been extended to one who observed the victim's suffering at a place other than where the injury-causing event occurred or at a time not closely connected to the event.

*752 The requirements of Article 2315.6, when read together, suggest a need for temporal proximity between the tortious event, the victim's observable harm, and the plaintiff's mental distress arising from an awareness of the harm caused by the event. The Legislature apparently intended to allow recovery of bystander damages to compensate for the immediate shock of witnessing a traumatic event which caused the direct victim immediate harm that is severe and apparent, but not to compensate for the anguish and distress that normally accompany an injury to a loved one under all circumstances.
Trahan, 728 So.2d at 1279 (footnotes omitted).
The Trahan court went on to conclude that the defendant's failure to read the correct chart and to provide treatment to the patient based on the data on the chart, a negligence of omission, was not an injury-causing event in which the claimant was contemporaneously aware that the event had caused harm to the direct victim, as required for recovery of Article 2315.6 damages. Trahan, 728 So.2d at 1280. Moreover, the court found that assuming the doctor's negligent discharge of the patient was an injury-causing event, that event was not a traumatic event likely to cause severe contemporaneous mental anguish to an observer, even though the ultimate consequences were tragic indeed. Without answering whether bystander damages would have been recoverable had the claimants been contemporaneously aware of the harm caused by the event, the court found that such contemporaneous awareness was not present under the facts of Trahan, 728 So.2d at 1280-81.
In the present case, Dr. Pittman argues that the plaintiffs failed to prove the third and especially the fourth requirements for recovery of Lejeune damages. Thus, even if we assume, without deciding, that the second requirement under Article 2315.6 was met and there was a contemporaneous awareness by the claimants that Dr. Pittman's failure to admit Mr. Magee to the hospital was causing Mr. Magee harm, we find that the evidence supports a determination that the fourth requirement of recovery under Article 2315.6the emotional distress suffered by the claimant is severe, debilitating and foreseeablewas not met. "Serious emotional distress" may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case. A non-exhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia and shock. Norred v. Radisson Hotel Corporation, 95-0748, p. 6 (La.App. 1st Cir.12/15/95), 665 So.2d 753, 756. While we acknowledge that it was traumatic to see Mr. Magee die of a heart attack, we find that the event does not fall within the scope of allowable recovery. There was no medical testimony or diagnosis regarding any emotional distress sustained by the plaintiffs as a result of witnessing the events leading up to Mr. Magee's death or seeing Mr. Magee die of a heart attack.[7] Nor did the plaintiffs give any specific testimony regarding serious emotional problems they were experiencing as a result of the death of Mr. Magee. Without any such evidence, we cannot reverse the jury's decision to deny recovery of Lejeune damages. See Norred, 665 So.2d at 758-59; Martin v. Francis, 600 So.2d 1382, 1385 (La.App. 1st Cir.) writ denied, 606 So.2d 541 (La.1992); Thomas v. Schwegmann Giant Supermarket, Inc., 561 So.2d 992, 997 (La.App. 4th Cir.1990).

*753 SOURCE OF PAYMENT INQUIRY BY JURY DURING DELIBERATION

(Dr. Pittman's Assignment of Error No. 4)
In this assignment of error, Dr. Pittman asserts that the jury erred in considering the source of payment of the verdict. During deliberations, the jury sent a question to the trial court inquiring about the source of funds through which a verdict would be paid. The trial court replied that the jury was not to consider the source of payment.
We first note that Dr. Pittman has not presented any proof that the jury considered the source of payment. Instead, he merely argues that he "feel[s] this is relevant. This clearly evidences a thought process that was prejudicial to the defense." As soon as the question was raised to the trial court, the trial court properly and promptly admonished the jury that it was not to consider the source of payment. Additionally, we note that the law does not permit inquiry into the thought processes by which a jury reached a verdict. Cosie v. Aetna Casualty & Surety Insurance Company, 527 So.2d 1105, 1107 (La.App. 1st Cir.1988); Louisiana Farm Bureau Casualty Insurance Company v. Williams, 476 So.2d 810 (La.1985). Thus, we are not persuaded by Dr. Pittman's argument. This assignment of error is without merit.

CONCLUSION
For the reasons set forth in this opinion, the judgment of the trial court is amended in part, and as amended, is affirmed. That part of the judgment which allowed the jury's allocations of 60 percent fault to the Houston physicians and 20 percent fault to Dr. Pittman to stand is amended to allocate 40 percent fault to the Houston physicians and 40 percent fault to Dr. Pittman. That part of the judgment that allowed the jury's award for loss of services and support to stand is amended to raise the loss of services and support award to $444,985. In all other respects, the judgment is affirmed. Costs of this appeal are assessed to Dr. Pittman.
AMENDED IN PART; AS AMENDED, AFFIRMED.
NOTES
[1] Hon. William F. Kline, Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The narrative of Dr. Pittman that was submitted to the medical review panel by Dr. Pittman's attorneys listed diabetes as Dr. Pittman's primary concern; did not reference cardiac concerns; and did not mention that Mr. Magee refused Dr. Pittman's purported desire to hospitalize Mr. Magee on July 25. Dr. Pittman contended that his attorneys prepared and submitted the narrative without his knowledge or approval.
[3] We note that the record does not contain the trial court's ruling on Dr. Pittman's motion in limine. However, because Dr. George testified at the trial, we will infer that the motion was denied.
[4] Sister Mary Baudier is erroneously referred to as Sister Mary Gaudier in the trial transcript.
[5] Dr. Roy Montalbano was called by Dr. Pittman as a witness.
[6] Dr. Montalbano's change of opinion result ed from a credibility determination he made that Mrs. Magee was being untruthful in stating she called Dr. Pittman on July 27 to report the Friday night pain episode. Dr. Montalbano chose to believe Dr. Pittman over Mrs. Magee because in his opinion, "patients get things confused, doctors usually don't." Dr. Montalbano conceded that if Mrs. Magee did call Dr. Pittman on July 27 to report the Friday night pain episode, then Dr. Pittman breached the standard of care by failing to send Mr. Magee to the hospital.
[7] We note this as a fact to be considered, as we are aware that awards for Lejeune damages have been upheld by appellate courts where there was no diagnosis or other clinical proof of a psychiatric disorder. See Blair v. Tynes, 621 So.2d 591, 601 (La.1993); Dixon, 580 So.2d at 442; Matthews v. Turner, 566 So.2d 133, 135 (La.App. 5th Cir.), writ denied, 571 So.2d 645 (La.1990).