# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 20-636

**TARLTON BERNARD AND ADDISON PROVOST**

**VERSUS**

**BFI WASTE SERVICE, LLC, OLD REPUBLIC INSURANCE COMPANY, PERMANENT GENERAL ASSURANCE CORPORATION, HAROLD COMEAUX II, AND VAN R. DAVIS**

**\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 124384, DIVISION "H"
HONORABLE CURTIS SIGUR, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***
**JONATHAN W. PERRY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Billy Howard Ezell, Van H. Kyzar, and Jonathan W. Perry, Judges.

**AFFIRMED.**

**Marcus J. Plaisance**
**Mark D. Plaisance**
**Plaisance Law, LLC**
**P. O. Box 1123**
**Prairieville, LA 70769**
**(225) 772-5297**
**COUNSEL FOR APPELLANT:**
**TARLTON BERNARD**

**L. Clayton Burgess**
**605 West Congress Street**
**Lafayette, LA 70501**
**(337) 234-7573**
**COUNSEL FOR APPELLANT:**
**TARLTON BERNARD**

**Kreig A. Breaux**
**Landry, Watkins, Repaske & Breaux**
**P. O. Drawer 12040**
**New Iberia, LA 70562**
**(337) 364-7626**
**COUNSEL FOR APPELLANT:**
**TARLTON BERNARD**

**Bret C. Beyer, Sr.**
**Megan E. Réaux**
**Hill & Beyer, APLC**
**101 La Rue France**
**Suite 502**
**Lafayette, LA 70508**
**(337) 232-9733**
**COUNSEL FOR APPELLEES:**
**BFI Waste Services, LLC, Harold Comeaux, II,**
**And Old Republic Insurance Company**

**Robert Guillory**
**556 Jefferson Street #500**
**Lafayette, LA 70501**
**(337) 234-0500**
**COUNSEL FOR APPELLEE:**
**Addison Provost**

**PERRY, Judge.**

In this suit for damages, Tarlton Bernard ("Mr. Bernard") appeals the jury's assessment of comparative fault, as well as its determination of damages, contending Vernon Davis ("Mr. Davis"), the driver of the car in which Mr. Bernard was a passenger, should have been found free of fault, and the damages awarded for lost wages are too low. Through an answer to the appeal,[1] BFI Waste Services, LLC ("BFI"), Harold Comeaux, II ("Mr. Comeaux"), and Old Republic Insurance Company ("Old Republic") (collectively referenced as "Defendants") contest the jury's assessment of comparative fault, as well as its determination of damages, contending the jury erred in casting Mr. Comeaux with any fault, and, alternatively, that the jury's award of general damages was excessive. For the following reasons, we affirm.

## FACTS AND PROCEDURE

On Wednesday, March 5, 2014, the day after Mardi Gras, an accident occurred at approximately 1:30 a.m. when a vehicle driven by Mr. Davis struck a BFI solid waste collection truck driven by Mr. Comeaux. At the time of the accident, Mr. Bernard was a front seat passenger and Addison Provost ("Mr. Provost")[2] was the rear seat passenger. It was conceded that at the time of the collision Mr. Comeaux was in the course and scope of his employment with BFI. Old Republic insured Mr. Comeaux and BFI at the time of the accident.

The accident occurred in New Iberia in an area where East St. Peter Street runs as a three-lane, one-way street. Mr. Comeaux was traveling to collect waste in

---

[1] Mr. Bernard has moved to have the Defendants' answer to the appeal stricken. We will address that motion later in this opinion.

[2] Mr. Provost is also a plaintiff in this litigation. However, although it was agreed that the jury's allocation of fault would be applicable to him, the parties agreed that the trial judge would determine the damages awardable to him. Mr. Provost is not a party to this appeal. There is nothing in the record to indicate how the trial court ruled.

a dumpster behind Winn-Dixie; this task required him to make a left-hand turn from East St. Peter Street. The jury heard disputed versions of how the accident occurred, and that will be addressed more fully later in this opinion. Suffice it to say, a collision happened in the far-left lane of the one-way street between the BFI truck and the vehicle in which Mr. Bernard was a passenger.

Mr. Bernard filed suit against the Defendants, alleging that he injured his low back in the accident; this injury ultimately resulted in lumbar fusion surgery at the L4-5 level. He sought damages for past medical expenses, future medical expenses, past pain and suffering, future pain and suffering, past mental anguish, future mental anguish, past and/or future lost wages, and loss of enjoyment of life.

After a four-day trial, the jury assessed fault forty percent (40%) to the Defendants and sixty percent (60%) to Mr. Davis. It then awarded damages in the following categories: $109,410.10 (past medical expenses); $5,000.00 (future medical expenses); $200,000.00 (past pain and suffering); $50,000.00 (future pain and suffering); $35,000.00 (past mental anguish); $15,000.00 (future mental anguish); $238,176.74 (past and/or future lost wages); and $100,000.00 (loss of enjoyment of life). These categories of damages totaled $752,586.84.

Approximately three months post-trial, Mr. Bernard objected to the proposed judgment, contending that the jury erroneously applied comparative fault when it calculated the total damage award. After conducting a hearing, the trial court denied Mr. Bernard's motion to recall, reconvene, and allow the jury to correct the alleged error. Thereafter, in compliance with the jury's assessment of comparative fault, the trial court signed the judgment casting the Defendants with damages of $301,034.74, forty percent of the jury's total damages, with legal interest thereon from the date of judicial demand until paid and cast each party with their own costs of court.

2

Subsequently, the trial court denied Mr. Bernard's post-trial motions for new trial, judgment notwithstanding the verdict, and additur. The trial court also denied the Defendants' motion for remittitur or new trial. This appeal followed.

Mr. Bernard presents four assignments of error:

1. A left-turning motorist has a duty to ensure he can execute the turn from his lane without danger to other motorists. But Harold Comeaux straddled the left lane and middle lane, and without determining whether he could safely do so, executed a wide left turn striking Van Davis's vehicle. Because Comeaux's actions were in complete disregard for the safety of Davis, a following motorist who was properly in the left lane, the jury erred by not finding Comeaux 100 percent at fault.

2. A jury commits legal error when it deviates from the jury instructions and discounts any damages award by its assessment of comparative fault. Because the jury awarded only 40 percent of the "gross" damages – calculated by reducing the damages requested by the jury's assessment of 40 percent liability to Comeaux—it committed legal error which the trial court should have corrected.

3. A stipulation removes an issue from controversy and removes the need for proving a particular fact at issue. The parties stipulated that Bernard's lost past and future wages fell within a definite range of at least $921,625.06 and at most $1,272,509.09. Because the jury awarded less than the low end of the range, even in light of its erroneous reduction, it abused its discretion.

4. Post-trial motions of JNOV, new trial, or additur are procedural vehicles to cure trial errors. Because the trial court had avenues, which it chose not to invoke, to cure the jury's erroneous reduction of damages by its assessment of liability, the trial court abused its discretion and committed legal error by not granting either a new trial, JNOV, or alternatively entering an additur.

In addition, the Defendants have answered the appeal. In their answer to the appeal,[3] the Defendants state:

---

[3] Later, in their brief to this court the Defendants urge the following assignments of error:

1. The jury's assignment of forty percent (40%) fault to the defendant-driver, Harold Comeaux, II, was not supported by the testimony and evidence presented at trial and should be reduced.

2. The jury's total award of general damages in multiple categories, as

3

> [T]he defendants-appellees, are aggrieved by the Judgment of the lower Court, and desire to answer the plaintiff-[appellant's] appeal on the grounds that the jury's liability finding and award of general damages, as memorialized in the Judgment, were erroneous. The defendants-appellees seek amendment of the jury's liability finding and award of general damages.

## MOTION TO STRIKE
## DEFENDANTS' ANSWER TO THE APPEAL

Mr. Bernard has filed a motion to oppose or strike the Defendants' answer to the appeal. Because the issues presented in the Defendants' answer share elements raised in Mr. Bernard's appeal, we will first address his motion to strike.

Mr. Bernard contends that although the Defendants timely filed their answer to the appeal, the answer is deficient. He contends: (1) the answer merely seeks a general amendment of the jury's liability finding and award of general damages; (2) La.Code Civ.P. art. 2133 requires specific complaints defining the relief demanded; and (3) because the Defendants' answer to the appeal is not specific and does not contain assignments of error,[4] this court should deny or strike the answer.

Louisiana Code of Civil Procedure Article 2133(A) provides, in pertinent part:

> An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later. The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer.

---

reflected in the Judgment of the trial court, was erroneously high considering the evidence presented at trial regarding the plaintiff's alleged injuries, treatment, and prognosis; therefore, said total award should be reduced.

[4] Briefly addressing Mr. Bernard's complaint that the answer did not contain assignments of error we point out that La.Code Civ.P. art. 2129 states that "[a]n assignment of errors is not necessary in any appeal."

Essentially, an "answer to an appeal" is itself an appeal, except that the answer must specifically state the relief requested, while an appeal usually seeks review of all parts of the judgment. *State ex rel. Guste v. Pickering,* 365 So.2d 943 (La.App. 4 Cir.), *writ denied,* 366 So.2d 556 (La.1978); *see also Grady v. Alfonso,* 315 So.2d 832 (La.App. 4 Cir. 1975).

> Generally, an answer to an appeal operates as an appeal only of those parts of the judgment complained about in the answer. *Liedtke v. Allstate Ins. Co.,* 405 So.2d 859 (La.App. 3 Cir.), *writ denied,* 407 So.2d 748 (La.1981); *City Savings Bank & Trust Co. v. Johnson,* 286 So.2d 131 (La.App. 3 Cir. 1973). However, the courts often interpret statements in an answer liberally to cover issues the appellee contests in view of the public policy favoring appeals. *Liedtke,* 405 So.2d 859.

Steven R. Plotkin, Louisiana Civil Procedure, Art.2133, § 1.

In *Liedtke,* Judge Stoker, writing for this court, stated that the language in an answer to an appeal should be given a broad and liberal construction rather than a restrictive one. As reflected in *Liedtke,* 405 So.2d at 870, the defendants answered the plaintiffs appeal stating, "[t]hat they are aggrieved by the finding of liability and the award of damages in the above-described judgment." Addressing that language, the *Liedtke* court ruled that this was sufficient to raise the question of whether the contributory negligence of the minor son of the plaintiff father (Liedtke) barred the recovery by the father of the minor son's medical expenses for which the answering defendants had been held responsible, i.e., the general reference in the *Liedtke* answer to liability and damages was sufficient to raise those issues generally. *See also Clark v. Schwegmann Giant Supermarket*, 96-2301 (La.App. 4 Cir. 1/13/99), 740 So.2d 137.

In the present case, we have reviewed the language of the Defendants' answer to the appeal. Based upon *Liedtke* and other like jurisprudence, we find there is no merit to Mr. Bernard's motion to deny/strike the Defendants' answer to the appeal.

5

## ALLOCATION OF FAULT

Mr. Bernard contends the jury manifestly erred when it found Mr. Davis, the driver of the overtaking or passing vehicle, with any fault. The Defendants, relying on the total lack of credibility of Mr. Bernard, Mr. Provost, and Mr. Davis in their testimony, argue in their answer to the appeal that the jury manifestly erred when it assessed any fault to Mr. Comeaux.

As a reviewing court, this court must give great deference to the allocation of fault as determined by the trier of fact. *Fontenot v. Patterson Ins.*, 09-669 (La. 10/20/09), 23 So.3d 259. The allocation of fault is within the sound discretion of the trier of fact and will not be disturbed on appeal in the absence of manifest error. *Layssard v. State, Dep't. of Public Safety & Corrs.*, 07-78 (La.App. 3 Cir. 8/8/07), 963 So.2d 1053, *writ denied*, 07-1821 (La. 11/9/07), 967 So.2d 511. The manifest error standard demands great deference to the fact finder's conclusions; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). The trier of fact is charged with assessing the credibility of the witnesses and, in doing so, is free to accept or reject, in whole or in part, the testimony of any witness. *Johnson v. State, Dep't. of Transp. & Dev.*, 17-973, 17-974, (La.App. 1 Cir. 4/3/19), 275 So.3d 879, *writ denied*, 19-676 (La. 9/6/19), 278 So.3d 970. If the jury's findings are reasonable after reviewing the record, we cannot reverse those findings even if we may have decided differently had we been sitting as the trier of fact. *Rosell*, 549 So.2d 840.

All motorists owe a general duty to observe what should be observed. *Lopez v. Cosey*, 16-0812, 16-0813 (La.App. 1 Cir. 2/17/17), 214 So.3d 18. A motorist has a duty to drive in a careful and prudent manner, so as not to endanger the life, limb,

or property of any person.  La.R.S. 32:58.  Additional duties also arise depending on the motorist's movements on the roadway in relation to other vehicles.  *ES v. Thomas*, 17-1213 (La.App. 1 Cir. 5/31/19), 278 So.3d 982.

Louisiana Revised Statutes 32:104 provides:

A.  No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in R.S. 32:101[] or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety.

B.  Whenever a person intends to make a right or left turn which will take his vehicle from the highway it is then traveling, he shall give a signal of such intention in the manner described hereafter and such signal shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning.

C.  No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal.

D.  The signals provided for in R.S. 32:105(B)[5] shall be used to indicate an intention to turn, change lanes or start from a parked position and shall not be flashed on one side only on a parked or disabled vehicle, or flashed as a courtesy or "do pass" signal to operators of other vehicles approaching from the rear.

Commenting upon La.R.S. 32:104, the jurisprudence has held that a left turn across a highway is one of the most dangerous maneuvers a driver can execute, and therefore, before attempting same, a driver must initially ascertain by careful

---

[5]  Louisiana Revised Statutes 32:105 provides:

A.  Any stop or turn signal when required herein shall be given either by means of the hand and arm as provided in R.S. 32:106 or by signal lamps, except as otherwise provided in Paragraph B.

B.  Any motor vehicle in use on a highway shall be equipped with, and the required signal shall be given by, signal lamps when the vehicle is so constructed, loaded or operated as to prevent the hand and arm signal from being visible, both to the front and to the rear.

observation that the maneuver can be executed safely without danger to normal overtaking and oncoming traffic and must yield right-of-way to such vehicles. *U.S. Fid. & Guar. Co. v. Bergeron*, 148 So.2d 162 (La.App. 1 Cir. 1962); *see also ES*, 278 So.3d 982. The turning motorist has the right to assume that the following driver will observe all duties imposed by law and common sense. *Sterling v. Ritchie,* 182 So.2d 735 (La.App. 1 Cir. 1966). Nonetheless, the burden rests heavily on the motorist who desires to make a left turn to explain how the accident occurred and to show that he was free from negligence. *U.S. Fid. & Guar. Co.*, 148 So.2d 162.

Similarly, the statutory duties of a left overtaking vehicle are found in La.R.S. 32:73 which provides:

> The following rules shall govern the overtaking and passing of vehicles proceeding in the same direction, subject to those limitations, exceptions, and special rules hereinafter stated:
>
> (1) Except when overtaking and passing on the right is permitted, the driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance[] and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle.
>
> (2) Except when overtaking and passing on the right is permitted, the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal[] and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle.

The driver of an overtaking vehicle must be alert to the actions of the motorists preceding him on the highway. *Gohres v. Dryer*, 09-473 (La.App. 1 Cir. 11/18/09), 29 So.3d 640; *Husser v. Bogalusa Coca Cola Bottling Co.,* 215 So.2d 921 (La.App. 1 Cir. 1968). "More particularly, the driver of an overtaking or passing vehicle has the duty to ascertain before attempting to pass a preceding vehicle that from all the circumstances of traffic, lay of the land, and conditions of the highway, the passing can be completed with safety." *Duncan v. Safeway Ins. Co. of La.,* 35,240, 35,241,

8

pp. 3–4 (La.App. 2 Cir. 10/31/01), 799 So.2d 1161, 1164. *See also Palmieri v. Frierson,* 288 So.2d 620 (La.1974).

"Comparative negligence is determined by the reasonableness of the party's behavior under the circumstances." *Edmond v. Cherokee Ins. Co.,* 14-1509, p. 6 (La.App. 1 Cir. 4/24/15), 170 So.3d 1029, 1037. As to the allocation of fault, the trier of fact is bound to consider the nature of each party's wrongful conduct "and the extent of the causal relationship between that conduct and the damages claimed." *Watson v. State Farm Fire & Cas. Ins. Co.,* 469 So.2d 967, 974 (La.1985). In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. *Id*.

Mr. Bernard asserts a twofold argument. First, he contends Mr. Comeaux did not exculpate himself from the presumption he caused the wreck. Secondly, he argues there was no evidence Mr. Davis, the driver of the vehicle in which Mr. Bernard was a passenger, drove imprudently or contributed to the wreck in any way. We will address these contentions separately.

In *Soileau v. State ex rel. Dep't of Transp. & Dev. of State of La.,* 97-1541, p. 6 (La.App. 3 Cir. 12/9/98), 724 So.2d 834, 838, recognizing a jurisprudentially created presumption,[6] we stated:

---

[6] Although not always recognized in the caselaw, *see Duzon v. Stallworth,* 01-1187 (La.App. 1 Cir. 12/11/02), 866 So.2d 837, *writs denied sub nom., Duzon ex rel. Cmty. of Acquets & Gains v. Stallworth,* 03-589 (La. 5/2/03), 842 So.2d 1101, 03-605 (La. 5/2/03), 842 So.2d 1110,

As explained by the Louisiana Supreme Court in *Shephard on Behalf of Shephard v. Scheeler,* 96-1690, p. 18 (La.10/21/97); 701 So.2d 1308, 1318:

> A presumption of negligence arises when a driver leaves his own lane of traffic and strikes another vehicle. In such a case, the burden of proof on such a defendant motorist is to show that he was not guilty of any dereliction, however slight. . . . *Ferrell v. Fireman's Fund Ins. Co.,* 94-1252 (La. 2/20/95), 650 So.2d 742.

Contrary to the plaintiff's assertion, the presumption of negligence arising against a driver who leaves his own lane of travel relates only to his own negligence and is a factor to be considered in the assignment of any comparative fault.

In the present case, the trial court, contrary to the Defendants' contention, provided the jury with an instruction regarding the jurisprudentially recognized presumption of liability associated with a left-turn movement. It also instructed the jury on the left-turning motorist's obligation to refute that presumption if he is able. Specifically, the trial court provided the following jury instruction:

> A left turn movement is generally characterized as a dangerous maneuver not to be undertaken until the motorist ascertains that it can be made in safety. A left turning motorist involved in an accident is burden[ed] with a presumption of liability and the motorist must show that he is free of negligence. It is incumbent on a motorist attempting a left turn not only to signal his intention to do so, but to look for both oncoming and overtaking traffic and ascertain that the turn can be made with reasonable safety.

It is clear from this record that the jury heard two very disputed descriptions of the accident. However, it is also clear that on the early morning hours of this

---

La.Code Evid. art. 302(3) and Official Comment (d) to that article clearly state that the codal articles on presumptions enumerated in the Louisiana Code of Evidence govern only legislatively created presumptions and not jurisprudentially recognized presumptions. Notwithstanding, as noted in Force & Rault, Handbook on Louisiana Evidence Law, 556 (2019):

> [S]hould a court decide in a given case involving a judicially created presumption that the appropriate result, based on prior cases or otherwise, is identical to that mandated by this Chapter had the presumption been legislatively created, it is of course not inappropriate to cite the provisions of this Chapter as persuasive or of comparative interest[.]

accident on this three-lane, one-way street, the headlights of Mr. Davis's vehicle were the only ones to the rear of Mr. Comeaux.

Mr. Bernard, Mr. Provost, and Mr. Davis testified that they met on Mardi Gras day at approximately 11:30 a.m. in New Iberia, and Mr. Provost gave them haircuts. Afterwards, the three of them rode in Mr. Davis's car to Lafayette, Parks, and Jeanerette, returning to New Iberia; according to them, they did not attend any Mardi Gras festivities. They further testified that during their time together, they each drank two beers in the early afternoon of Mardi Gras and had no other alcoholic beverages.

Mr. Davis, the driver of the car, set the stage, describing in detail the time just prior to the accident. He stated that his vehicle was stopped for a red traffic light at the intersection of St. Peter and Lewis Streets in the left lane of St. Peter Street for some time prior to the accident. Mr. Davis testified that after the red traffic light cycled to green, he began following the BFI truck at a speed of approximately thirty-five miles per hour; at that time, the BFI truck was traveling in the middle lane on the three-lane, one-way street as Mr. Davis approached from the rear, seven or eight car lengths behind. As Mr. Comeaux slowed the BFI truck in the middle lane, Mr. Davis testified that he signaled to enter the left lane as he prepared to legally pass Mr. Comeaux.[7] Mr. Davis stated that as he began his passing maneuver, Mr. Comeaux, who did not signal his move, began his turn from the middle lane, cutting off Mr. Davis in the left lane, and striking the front right (passenger side) of his vehicle. Mr. Davis's vehicle careened off the BFI truck and came to rest near the

---

[7] There is no mention in the testimony about why Mr. Davis sought to pass the BFI truck on the left. The evidence shows East St. Peter Street is a three-lane, one-way street. It also is undisputed that these were the only two vehicles on this street at the time of this accident. Clearly, under the provisions of La.R.S. 32:73, Mr. Davis could have legally passed the BFI truck on the right.

11

dumpster Mr. Comeaux was attempting to service behind Winn-Dixie. Mr. Davis estimated that approximately three or four minutes elapsed from the time he left the red light to the time of the accident.[8] The testimonies of Mr. Provost and Mr. Bernard mirrored that of Mr. Davis.

On cross-examination by Mr. Bernard's counsel, Mr. Comeaux answered affirmatively to this question posed to him, "Now, isn't it true that you did not even see the other vehicle[] that you collided with before the collision occurred, isn't that true?" He also admitted that he was traveling at a slow rate of speed, that he had no idea of the speed of Mr. Davis's vehicle, and that he partially crossed into the middle lane of St. Peter Street as he made his left-hand turn to empty the waste container more easily behind the Winn-Dixie store.

Later, on direct examination, Mr. Comeaux told the jury that prior to leaving the BFI yard, he determined that his turn signals and brake lights were operational and the five yellow, pulsating strobe lights across the back of the truck were functioning properly. Mr. Comeaux then described his route on the morning of the accident. Initially, he made a right turn on a green light as he traveled from Lewis Street to St. Peter Street, a three-lane, one-way street. As he made this initial turn, he observed headlights to his left that appeared to be in the left-hand lane of St. Peter Street. Mr. Comeaux said he immediately occupied the right lane of St. Peter Street and, after scanning his mirrors and engaging his left-turn signal, he moved to the middle lane and then eventually to the left lane to prepare to service the dumpster at Winn- Dixie; as he made these maneuvers, he observed headlights in his right mirror

---

[8] In an interesting lawyering technique, during cross-examination counsel for the Defendants started a stopwatch and asked Mr. Davis to let him know when three minutes elapsed. When challenged this way, Mr. Davis had counsel stop the time to approximate this interval of time. The result—an eighteen second lapse of time.

in the right lane of St. Peter Street. According to him, the accident occurred when he straddled the left and middle lanes of St. Peter Street with his left-turn signal engaged to make a wide left turn into the Winn-Dixie parking lot to service the dumpster. According to Mr. Comeaux, the vehicle in which Mr. Bernard was a passenger suddenly and rapidly sped from the far-right lane, across the middle lane, and into the left lane to pass the BFI truck on the left. The BFI waste truck was immediately disabled, traveled a few feet, and came to rest in the left and middle lanes of East St. Peter Street.

Immediately after the accident, Mr. Comeaux saw the three men in Mr. Davis's vehicle, observed the air bags in their vehicle had deployed, and their vehicle was significantly damaged. Mr. Comeaux heard the rear seat passenger, later identified as Mr. Provost, say, "We need to get out of here." Thereafter, Mr. Comeaux called 911. However, before the investigating officers arrived at the site of the collision, less than five minutes post-accident, the three occupants of Mr. Davis's vehicle had left the scene of the accident.

Iberia Parish Sheriff Deputy Isaiah Rochon ("Deputy Rochon"), located Mr. Davis walking in a nearby neighborhood. Mr. Davis was soaked from the knees down, suggesting to Deputy Rochon that Mr. Davis had walked through a large ditch along St. Peter Street when he left the scene of the accident. Deputy Rochon further testified that Mr. Davis smelled of alcohol, his eyes were bloodshot, and his speech was slurred. Even though Deputy Rochon had not yet been trained to conduct a field sobriety test, he opined that these were "telltale signs I've seen of someone drinking

13

. . . ."[9] Although Mr. Davis denied having been involved in the accident, Deputy Rochon transported him back to the accident scene.

Officer Eric Bell, another Iberia Parish Sheriff Deputy, located Mr. Provost not far away outside the Hop In convenience store. When Officer Bell approached, Mr. Provost attempted to run away and had to be tackled. Mr. Provost testified that he left the accident scene, hoping to use the payphone at the Hop In to call his mother because he lost his cell phone in the accident. At trial, Officer Bell testified that he was familiar with the Hop In convenience store and stated that the store has never had a payphone.

Although Mr. Bernard was not located that night and neither Mr. Davis nor Mr. Provost identified him as having been in the vehicle at the time of the accident, Mr. Bernard came forward approximately twelve days later claiming to have been in Mr. Davis's vehicle at the time of the accident. At trial, Mr. Bernard stated that he left the scene of the accident to go to his supervisor's nearby home because his cell phone, too, was lost in the car at the time of the accident. His supervisor immediately took him to Dautrieve Hospital for treatment of injuries he received in the accident. Mr. Bernard's treatment records at Dautrieve Hospital on the morning of the accident indicated that his breath smelled of alcohol.

---

[9] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Evid. art. 401. Louisiana Code of Evidence Article 701 allows a lay witness with firsthand knowledge to testify to an opinion "[r]ationally based on the perception of the witness; and" if it is "[h]elpful to a clear understanding of his testimony or the determination of a fact in issue." *See* La.Code Evid. art. 701, 2003 Authors' Notes (1). Thus, a lay witness can give opinion testimony based on his training, investigation, perception of the scene, and observation of physical evidence. *Wingfield v. State, Dep't of Transp. & Dev.,* 01-2668, 01-2669 (La.App. 1 Cir. 11/8/02), 835 So.2d 785, *writ denied,* 03-0313, 03-0339, 03-0349 (La. 5/30/03), 845 So.2d 1059. *See also Temple v. State ex rel. Dep't of Transp. & Dev.*, 02-1977 (La. App. 1 Cir. 6/27/03), 858 So.2d 569*, writ denied*, 03-2116 (La. 11/7/03), 857 So.2d 501.

At trial, the jury was presented with the cell phone records of Mr. Provost and Mr. Bernard. Those records showed that, contrary to their trial testimony, both individuals made and received many cell phone calls immediately after the accident, none to 911.

Finally, the jury heard impeachment testimony of Mr. Davis and Mr. Provost about numerous prior criminal convictions that were not divulged during their pre-trial depositions. Among those convictions were Mr. Davis's convictions for DWI in 2008, 2011, and 2013.

This record presents witnesses with very different recollections of the facts regarding the accident, and a cast of characters whose actions and demeanor, pre- and post-accident, focused the jury's attention on the question of witness credibility. Against that backdrop, this court is reminded, once again, of the role of juries in our system of justice and the function of a reviewing court.

In *Rosell*, 549 So.2d at 844-45 (citations omitted), our supreme court stated:

> Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

The record shows that the jury was keenly aware of the discrepancy of testimony regarding the accident. Particularly, we observe the jury's request during deliberation to have Mr. Comeaux's testimony read to them again.[10] After hearing

---

[10] Louisiana Code of Civil Procedure Article 1795 provides:

A. If the jury after retiring for deliberation, requests a review of certain testimony or other evidence, they shall be conducted to the courtroom.

from the attorneys and calling the jury into the courtroom, Mr. Comeaux's testimony, in its entirety, was played for the jury. His testimony undeniably showed his wide maneuver from the left lane, partially into the middle lane, just prior to the accident; it also detailed his appreciation of the movement of the vehicles and his actions, some of which was skillfully challenged.

After five and one-half hours of deliberation, the jury, in a ten to two verdict, assessed fault sixty percent (60%) to Mr. Davis and forty percent (40%) to Mr. Comeaux. After carefully reviewing the record and considering Mr. Bernard's argument that Mr. Davis should have been found free from fault, as well as the Defendants' contention in their answer to the appeal that Mr. Comeaux should have been found free from fault, we find no abuse of discretion in the jury's assessment of fault.

## IMPUGNING THE JURY'S DAMAGE AWARDS

Mr. Bernard makes two arguments regarding the jury's assessment of damages. In the first instance, he contends that the jury committed legal error when it reduced the damage award by the fault it assessed to Mr. Davis. Secondly, he

---

B. After giving notice to the parties, the court may have the requested testimony read to the jury and may permit the jury to examine the requested material admitted into evidence.

The Comments to La.Code Civ.P. art. 1795 state:

(a) This article is new and addresses the problem of a request by the jury to refresh its memory about testimony or to clear up questions about materials admitted into evidence. The court is given the discretion to grant the request. Any reexamination of testimony is to be done in the courtroom and in the presence of the parties if they choose to be present after being properly notified.

(b) Under this article the judge may allow the jury to examine objects and writings only in the courtroom, or he may allow the jury to take the objects or writings to the jury room under Art. 1794.

(c)"Read" is intended to include not only repeating testimony from a transcript or reporter's notes, but also playing back the testimony from any recording.

argues that the jury also legally erred when it failed to award his past and future lost wages in conformity with the parties' stipulation to that loss. We will address these arguments separately and in that order.

*Jury's improper reduction of damages*

To better frame the legal argument made that the jury improperly reduced the damage award to conform with its assessment of fault, the following procedural facts are presented in the record.

A jury trial as to liability and the assessment of damages was held on March 11 through March 14, 2019; after the jury verdict was announced and the jury was polled, the trial court discharged the jury. Almost three months later, on June 10, 2019, Mr. Bernard objected to the proposed form of judgment presented by the Defendants. In that objection, Mr. Bernard requested that "this matter be held, not signed . . . and not entered of record until this matter on recalling and reconvening the jury can be heard . . . ." Thereafter, on June 13, 2019, Mr. Bernard filed a Motion to Rescind Jury Discharge and Recall Jury for Further Deliberation. Among other allegations that the impaneled jury was suspected to have made material and critical errors, Mr. Bernard alleged:

> The jury is suspected to have failed to understand and correctly apply the Closing Instructions with which they were provided by this Honorable Court in that they recited and returned an award "net" of comparative fault, rather than the "gross" award before and independent of their comparative fault verdict determinations as charged . . . [in paragraph 4] of Closing Instructions.

In support of his contention, Mr. Bernard further alleged:

> This suspicion of jury error is reasonable given the unlikelihood, absent error, that the jury would return a total award of $752,586.84 which is, *to the penny*, exactly of 40% (the defendant, Harold Comeaux, II's, jury apportioned comparative fault) of $1,881,467.18 (which is $1,881,467.1 on a standard desk calculator) the total award request[ed] by plaintiffs' counsel in closing. Simply put, the jury "did

17

the math" on their verdict ($1,881,467.1 x 40% = $752,586.84) and reduced their verdict by plaintiffs' driver's comparative fault when they shouldn't have.

Thus, Mr. Bernard requested that the jury foreman be ruled into court to address this question at a contradictory hearing.

After receiving the Defendants' opposition to Mr. Bernard's motion, the trial court conducted a contradictory hearing on August 23, 2019. Before requiring the jury foreman's presence, the trial court entertained oral argument and denied Mr. Bernard's motion.

From the outset, we observe that much of Mr. Bernard's argument is based upon his reference to a photograph of a whiteboard presented to the jury during closing argument with suggested awards for the various categories of damages he deemed appropriate and a photograph of a generic hand calculator. Our review of the record shows that neither photograph was admitted into evidence at any time. Rather, these photographs were only attached to Mr. Bernard's motion for a new trial.

Appellate courts are courts of record and may not review evidence that is not in the appellate record or receive new evidence. *Denoux v. Vessel Mgmt. Serv., Inc.*, 07-2143 (La. 5/21/08), 983 So.2d 84. Evidence not properly and officially offered and introduced cannot be considered, even if it is physically placed in the record. *Id.* As noted by the second circuit in *Moody Inv. Corp. v. Occupants of 901 E. 70th St.*, 43,396 (La.App. 2 Cir. 8/13/08), 990 So.2d 119, an attachment to a motion for a new trial which were not identified as exhibits filed into evidence cannot be considered on appellate review.

Our review of the record shows that these photographs were simply attached to Mr. Bernard's motion for new trial and never introduced into evidence.

Considering the jurisprudence, we do not find that these two photographs can be considered by us on appellate review.[11]

Now, Mr. Bernard, as he did in the trial court, asks us to delve into whether the jury impermissibly awarded a net sum of damages and failed to award lost wages within the range purportedly stipulated to by the Defendants. For the following reasons, we find no merit to Mr. Bernard's argument.

In *Parker v. Centenary Heritage Manor Nursing Home*, 28,401, p. 9 (La. App. 2 Cir. 6/26/96), 677 So.2d 568, 574, *writ denied*, 96-1960 (La. 11/1/96), 681 So.2d 1271, the appellate court, addressing Louisiana's traditional "jury shield" statute, stated:

> The sanctity and privacy of jury deliberations is strongly safeguarded in Louisiana. Neither party is allowed to unlock the closed door of those deliberations, except in very limited circumstances. As the trial court correctly found, Louisiana law is well settled that the affidavits and testimony of jurors cannot be used to impeach their verdicts. *Theriot v. Theriot,* 622 So.2d 257 (La.App. 1st Cir.1993), writ denied, 629 So.2d 1138 (La.1993); *Uriegas v. Gainsco,* [94-1400 (La.App. 3 Cir. 9/13/94), 663 So.2d 162, *writ denied*, 95-2485 (La. 12/15/95), 664 So.2d 458]. La.Code Evid. art. 606(B) provides in pertinent part:
>
>> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, . . . . Nor may his affidavit or evidence of any statement

---

[11] Notwithstanding, even without those photographs, the record shows that in conformity with La.Code Civ.P. art. 1794, the trial court permitted the jurors to take notes during the trial. As such, in addition to the monetary stipulations relative to Mr. Bernard's medical expenses ($109,400.10) and the average of wages, past and future, Mr. Bernard may have lost ($1,097,067.08), counsel for Mr. Bernard highlighted those particularized sums during his closing argument to the jury. With regards to the other line items of damages requested, counsel did not suggest any particularized amounts in his closing argument. Rather, counsel for Mr. Bernard suggested $1,881,467.18 as a total for all damages. Thus, utilizing their notes, the jury could have arithmetically deduced the remaining suggested general damages.

19

by him concerning a matter which he may be precluded from testifying be received for these purposes.

One reason for this rule is that if, after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would invite tampering with jurors and would place it in the power of a dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under the sanction of oath. *Uriegas*, [663 So.2d 162].

*See also Landry v. Pediatric Servs. of America, Inc.*, 15-899 (La.App. 3 Cir. 4/6/16), 189 So.3d 540, *writs denied*, 16-785, 16-845 (La. 6/17/16), 192 So.3d 771, 773; *Dubois v. Armstrong*, 15-345 (La.App. 3 Cir. 2/10/16), 186 So.3d 305, *writ denied*, (La. 4/22/16), 191 So.3d 1045; *State v. Wallace*, 12-594 (La.App. 5 Cir.2/21/13), 110 So.3d 1199, *writ denied*, 13-646 (La. 10/11/13), 123 So.3d 1217; *Williams v. Super Trucks, Inc.*, 36,993, 36,994 (La.App. 2 Cir. 4/9/03), 842 So.2d 1210, *writ denied*, 03-1303 (La. 9/5/03), 852 So.2d 1042; *LeBlanc v. Western Heritage Ins. Co.*, 02-788 (La.App. 5 Cir. 12/30/02), 837 So.2d 81, *writ denied*, 03-320 (La. 4/4/03), 840 So.2d 1221; *State v. Currie*, 00-2284 (La.App. 4 Cir. 2/13/02), 812 So.2d 128, *writ denied*, 02-786 (La. 11/15/02), 829 So.2d 421.

Our review of Mr. Bernard's argument reveals that he "suspected [the jury] to have failed to understand and correctly apply the Closing Instructions[.]" He further argued that "[t]his suspicion of jury error is reasonable. . . ." Speculation and suspicion are not grounds for courts, whether they be trial or appellate, to pierce the jury shield. Moreover, Mr. Bernard's argument is undermined by the fact that the jury awarded the entirety of his past medical expenses and, as elaborated upon more fully later in this opinion, an award of $400,000.00 in general damages.

*Stipulation: Lost wages, past and future*

Mr. Bernard's other argument about the adequacy of the damage award is that the jury was clearly wrong when it failed to award him past and future lost wages at

a sum within the range of damages to which the Defendants allegedly stipulated. The Defendants counter that they may have stipulated to the range Dr. G. Randolph Rice ("Dr. Rice") projected as Mr. Bernard's past and future lost wages, but they never stipulated that Mr. Bernard proved his entitlement to such an award.

To better understand this stipulation, we note that Mr. Bernard took the video deposition of Dr. Rice on November 6, 2017, in anticipation of a jury trial scheduled for November 13, 2017. That trial date would later be reset for January 22, 2018, refixed for May 13, 2019, and ultimately heard prior thereto on March 11, 2019. The stipulation was entered not only to allow Dr. Rice to update his calculations because of trial delays but also to address Mr. Bernard's actual wages as reflected on his 2013 tax return. This latter reason significantly reduced Mr. Bernard's yearly wages from $64,000.00 to $49,834.00.

In the present case, the trial court included the following stipulation in its jury charge, "The parties agree that if Dr. Rice had used Tarlton Bernard's W-2 earnings to make his calculations for past and future loss wages, his calculations would be a low of $921,625.06 and a high of $1,272,509.09." Based upon that statement, Mr. Bernard contends this court should amend the award for past and future lost wages from $238,176.74 to an amount within the stipulated range.

Louisiana Civil Code Article 1853 states, in pertinent part, "A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it." "A judicial confession is a party's explicit admission of an adverse factual element and has the effect of waiving evidence as to the subject matter of the confession from issue." *Newman v. George,* 07-0620, p. 4 (La.App. 4 Cir. 9/26/07), 968 So.2d 220, 223 (quoting *Cichirillo v. Avondale Indus., Inc.*, 04-2918 , p. 6 (La. 11/29/05), 917 So.2d 424, 429. "It is well-

settled that a judicial confession or admission must be explicit, not merely implied."

*Pendleton v. Smith,* 95-1805, p. 5 (La.App. 4 Cir. 5/8/96), 674 So.2d 434, 439-40, *writ denied*, 96-1425 (La. 9/13/96), 679 So.2d 107.

In *Allison v. CITGO Petroleum Corp.*, 18-302, 18-303, p. 17 (La.App. 3 Cir. 12/19/18), 262 So.3d 936, 946-47 (quoting *Davis v. Kreutzer*, 93-1498 (La.App. 4 Cir. 2/25/94), 633 So.2d 796, 801, *writ denied*, 94-733 (La. 5/6/94), 637 So.2d 1050), this court further stated:

> Such a confession is designed to dispense with evidence and has the effect of withdrawing the subject matter of the confession from issue. *Jackson v. Gulf Insurance Co.*, 250 La. 819, 199 So.2d 886 (1967). The stipulation amounts to full proof against those who made it and becomes the law of the case and must be enforced. *Lockett v. Home Insurance Company*, 413 So.2d 230 (La.App. 4th Cir.1982). It binds all parties and the court when not in derogation of the law. *R.J. D'Hemecourt Petroleum Co. v. McNamara*, 444 So.2d 600 (La.1983), *cert. denied*, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 39 (1984).

After carefully reviewing the trial court's jury instructions, particularly its instruction to the jury regarding Dr. Rice's projections, we find no merit to Mr. Bernard's argument about the stipulation. Two statements in the record, one from counsel for the Defendants and the other from counsel for Mr. Bernard, illuminate our determination of this issue.

In a conversation with the trial court after Dr. Rice's projections were tweaked to better coincide with Mr. Bernard's W-2 figures and to compensate for the trial date having been rescheduled multiple times,[12] counsel for the Defendants stated (emphasis added):

> [F]or the sake of the stipulation, I certainly don't agree that those are correct numbers, but those are what Dr. Rice would have calculated using the – the W-2 figures . . . I agree that the number is a correct calculation. ***I'm not agreeing that it's owed or that is, - . . . actually, Mr. Bernard's wage loss.***

---

[12] The record shows the trial date was continued at least seven times since the time suit was first filed.

22

Additionally, our attention was drawn to this statement of Mr. Bernard's counsel in closing argument to the jury (emphasis added):

> [T]he parties agree that if Mr. Rice had used Tarlton Bernard's W-2 earnings to make his calculation for past and future wages, his calculations would be a low of nine twenty-one six twenty-five and a high of $1,272,509.00. I didn't make this up out of the air. This is a stipulation. We got an unchallenged expert and a stipulation. We got an unchallenged expert and a stipulation. Look, . . . with all due respect on [sic] opposing counsel, he's not an economist. Look, if he wants to challenge some numbers, bring somebody with a PhD to say they're doing something wrong. Don't just stipulate that the guy's an expert, stipulate to the amounts. *I'm not saying he stipulated he owes them, to the – to the amounts*, based on the W-2's, and act like we're doing something wrong. That's not what happened.

Clearly, the Defendants did not stipulate that they owed Mr. Bernard past and future loss wages within the window of calculation Dr. Rice proposed in his testimony.

Turning our attention to the jury's assessment of $238,176.74 for Mr. Bernard's past and/or future lost wages, the jury heard not only the testimony of Mr. Bernard as to his wage loss claim but also that of Dr. John Sledge ("Dr. Sledge"), his surgeon, Glen Hebert ("Mr. Hebert"), a vocational rehabilitation counselor, and Dr. Rice, the economist. In his projection of wage loss, Dr. Rice testified that he relied upon the testimony of Mr. Bernard, Dr. Sledge, and Mr. Hebert. We will review those testimonies as we further evaluate the jury award for lost wages.

At the time of the accident on March 5, 2014, Mr. Bernard was just shy of thirty-three years of age. He dropped out of school in the tenth grade and learned the welding trade with on-the-job training. At the time of the accident, he had worked as a welder for approximately nine years, earning $22.50 an hour and overtime of $33.75 an hour. He said that although Dr. Sledge fused his back at the L4-5 level in October 2014, he has not been able to return to work as a welder

because of continuing pain that requires him to take medication. Dr. Sledge last saw Mr. Bernard on July 15, 2015.[13]

Mr. Bernard was referred to Mr. Hebert to determine his loss of earning capacity. After reviewing Dr. Sledge's records and Mr. Bernard's educational and work history, Mr. Hebert opined that Mr. Bernard was not capable of returning to work as a welder. Relying on what Mr. Bernard told him, he initially determined that Mr. Bernard earned $64,000.00 a year prior to the accident. However, when confronted with Mr. Bernard's 2013 W-2, Mr. Hebert did not argue with the $49,834.00 total wages reflected by that tax record. Ultimately, Mr. Hebert opined that based upon the medical records he reviewed, Mr. Bernard could only perform light to sedentary work, making eight to nine dollars an hour.

Dr. Sledge first examined Mr. Bernard approximately three months post-accident. Based upon the X-rays and a series of MRIs, Dr. Sledge opined that Mr. Bernard had significant segmental disease at L4-5 with an annular tear and neural impingement. When facet injections of lidocaine, marcaine, and cortisone, and transforaminal epidural steroid injections provided only limited pain relief, Dr. Sledge surgically repaired Mr. Bernard's lumbar spine on October 23, 2014. At that time, Dr. Sledge performed an anterior lumbar interbody fusion at the L4-5 level. Dr. Sledge examined Mr. Bernard on a regular basis post-surgery; at those times, Mr. Bernard reported that he still had some back pain with occasional radiation of

---

[13] In his trial testimony, Mr. Bernard, without any elaboration, stated that he also saw Dr. Hodges. Our review of the record shows letterhead of the Lafayette Bone & Joint Clinic which lists Dr. Sledge and Dr. Daniel L. Hodges ("Dr. Hodges"); Dr. Hodges is listed as a specialist in physical medicine and rehabilitation. The medical records show that Dr. Hodges treated Mr. Bernard on November 16, 2015, December 16, 2015, and March 16, 2016. The record does not show where Dr. Hodges was ever deposed or testified at trial. The record further provides no evidence that Mr. Bernard was seen by any other doctor since he last saw either Dr. Sledge or Dr. Hodges.

pain into his right foot. Based upon his last examination of Mr. Bernard on July 15, 2015, slightly more than four years prior to Mr. Bernard's jury trial, and the extent and degree of progress Mr. Bernard reported at that time, Dr. Sledge opined that he would rate Mr. Bernard as capable of performing "between sedentary and possibly some light, light to medium [work], depending on how he's feeling with his symptoms[.]" Nevertheless, when asked to assign Mr. Bernard with a disability rating score, Dr. Sledge declined to make such an assignment because at his last medical visit post-surgery Mr. Bernard had not yet reached maximum medical improvement, the baseline that must be reached before a physician may assign a disability rating. In conclusion, Dr. Sledge stated that Mr. Bernard "felt he was better post-operatively when we last saw him than he was pre-operatively, both in terms of his symptoms and his function."

Dr. Rice's video deposition was presented to the jury. In that presentation, Dr. Rice not only determined the wages Mr. Bernard lost between the accident and the date of trial, he further presented the jury with various monetary projections regarding Mr. Bernard's future loss of wages. Based upon an annual salary of $64,000.00, his wage loss projections, past and future combined, ranged between $1,374,835, should he be able to return to work of some kind, and $2,175,233, should he be unable to return to any work. Pursuant to the stipulation which took into consideration the delayed trial and Mr. Bernard's actual yearly salary, Dr. Rice reduced his wage loss projections as being between a low of $921,625.06 and a high of $1,272,509.09.

It is well-recognized that the trier of fact is not bound by the testimony of an expert, such evidence is evaluated in the same manner as any other evidence. *Harris v. State ex rel. Dep't. of Transp. & Dev.*, 07-1566 (La.App. 1 Cir. 11/10/08), 997

25

So.2d 849, *writ denied*, 08-2886 (La. 2/6/09), 999 So.2d 785. Thus, a "trier of fact may accept or reject in whole or in part an opinion by an expert." *Id.* at 866. The effect and weight to be given expert testimony is within the broad discretion of the trial court. *Carmichael v. Brooks*, 16-93 (La.App. 3 Cir. 6/22/16), 194 So.3d 832, *writs denied,* 16-1396, 16-1501 (La. 11/7/16), 209 So.3d 100. The decision reached by the trial court regarding expert testimony will not be disturbed on appeal absent a finding that the trial court abused its discretion. *Louisiana State Bar Ass'n v. Carr & Assoc., Inc.,* 08-2114, p. 17 (La.App. 1 Cir. 5/8/09), 15 So.3d 158, 171, *writ denied,* 09-1627 (La. 10/30/09), 21 So.3d 292.

In the present case, the record shows that Mr. Bernard presented no evidence that he consulted a physician since he last saw Dr. Sledge years prior to trial. At the time Dr. Sledge last examined Mr. Bernard, he had not yet reached maximum medical improvement and a disability status could not yet be determined.

It is well settled that a plaintiff must prove by a preponderance of the evidence any element of damage in a tort case. *Davis v. State Farm Mut. Auto. Ins. Co.,* 590 So.2d 714 (La.App. 3 Cir. 1991); *Hopkins v. Travasos,* 569 So.2d 1056 (La.App. 3 Cir. 1990). Proof is by preponderance of the evidence when it shows that a fact sought to be proved is more probable than not. *Veazey v. State Farm Mut. Auto. Ins.,* 587 So.2d 5 (La.App. 3 Cir. 1991). A plaintiff who seeks to recover for loss of earning capacity must prove that the injuries sustained have incapacitated him from, in the future, doing work of a reasonable character, that is, work for which he was fitted by training and experience, of the same or similar kind in which he was engaged at the time of the accident. *Viator v. Gilbert,* 253 La. 81, 216 So.2d 821 (1968); *Aycock v. Gulf Coast Transp., Inc.*, 96-1471 (La.App. 3 Cir. 4/2/97), 692 So.2d 1334. A plaintiff's detailed and uncorroborated testimony as to loss of

earnings may, if reasonable and accepted by the trier of fact, support an award for such damages. *Mormon v. Stine, Inc.,* 95-615 (La.App. 3 Cir. 11/2/95), 664 So.2d 600. But, while the absence of independent corroborating evidence may not be fatal to plaintiff's burden of proving damages, lack of even a minimal degree of detail or specificity as to the extent of loss precludes an award of damages. *Gulf Am. Indus. v. Airco Indus. Gases,* 573 So.2d 481 (La.App. 5 Cir. 1990); *Coco v. Richland Gen. Contractors, Inc.,* 411 So.2d 1260 (La.App. 3 Cir.), *writ denied,* 413 So.2d 909 (La.1982). To recover, a plaintiff must show proof to reasonably establish his claim. *Weber v. Brignac,* 568 So.2d 1129 (La.App. 5 Cir. 1990). Accordingly, damages based on mere speculation and conjecture are not allowed. *Smith v. Louisiana Farm Bureau Cas. Ins. Co.,* 603 So.2d 199 (La.App. 3 Cir.), *writ denied,* 605 So.2d 1115 (La.1992); *Coon v. Placid Oil Co.* 493 So.2d 1236 (La.App. 3 Cir.), *writ denied,* 497 So.2d 1002 (La.1986).

It was within the purview of the jury to assess Mr. Bernard's credibility and whether he proved entitlement to his wage loss claim. Clearly, the jury heard Dr. Sledge's testimony that he last saw Mr. Bernard before he had reached maximum medical improvement and his opinion about Mr. Bernard's work future was qualified accordingly. We observe that the jury, without differentiating between past and future lost wages, awarded Mr. Bernard $238,176.74 in past and/or future lost wages. Such sum approximates what Dr. Rice determined as Mr. Bernard's past lost wages and leads us to conclude it did not find Mr. Bernard proved his claim for future lost wages. On this basis, we find no manifest error in the jury's determination of Mr. Bernard's claim for lost wages.

*The Defendants' Answer to Appeal: general damages*

In their answer to the appeal, the Defendants contend that the jury abused its discretion in awarding a total award of $400,000.00 in general damages. That award was broken down into five categories: $200,000.00 (past pain and suffering); $50,000.00 (future pain and suffering); $35,000.00 (past mental anguish); $15,000.00 (future mental anguish); and $100,000.00 (loss of enjoyment of life). Instead, after reviewing various appellate court cases involving alleged like injuries, the Defendants contend the highest reasonable award under the facts of this case is $250,000.00.

In *Boothe v. Dep't of Transp. & Dev. & Par. of E. Baton Rouge*, 18-1746 , pp. 9-10 (La. 6/26/19), 285 So.3d 451, 457–58, the Louisiana Supreme Court summarized the function of an appellate court in its evaluation of general damage awards:

> It is well-settled that vast discretion is accorded to the trier of fact in fixing general damage awards. La. Civ.Code art. 2324.1; *Duncan v. Kansas City Southern Railway Co.*, 00-0066 (La. 10/30/00), 773 So.2d 670. This vast discretion is such that an appellate court should rarely disturb an award of general damages. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. *Youn*, 623 So.2d at 1260.

> The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. *Cone v. National Emergency Serv. Inc.*, 99-0934 (La. 10/29/99), 747 So.2d 1085, 1089; *Reck v. Stevens*, 373 So.2d 498 (La.1979). Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976). In reviewing the facts, the reviewing court should examine whether the present award is greatly disproportionate to past awards for similar injuries, though prior awards are only a guide.

28

> *Bouquet v. Wal-Mart Stores, Inc.*, 08-0309 (La. 4/4/08), 979 So.2d 456, 459.

From the outset, we observe that the Defendants, after only a two-sentence summary of Mr. Bernard's treatment, immediately delved into purported similar cases. Such an approach disregards well-established jurisprudence that clearly states that resort to prior awards is only appropriate after the facts relative to this plaintiff are thoroughly reviewed and "then only for the purpose of determining the highest or lowest point which is reasonably within that discretion." *Boothe*, 285 So.3d at 458.[14]

Mr. Bernard testified he awoke from the impact—an impact severe enough to engage the air bags—splattered with blood and bleeding from the head. He presented shortly after the accident at Dautrieve Hospital where the medical records show that he had multiple abrasions to the right forehead. Mr. Bernard testified that the hospital personnel removed pieces of glass from his eye, cleaned him up, and scanned his head. He further stated that he had scarring on his head and arms, that his back started hurting immediately and that pain continued from the time of the accident through the time of trial.

After being treated at the hospital and by his primary care physician, Mr. Bernard was referred to Dr. Keith Mack ("Dr. Mack"), a family medicine specialist,

---

[14] The Defendants draw our attention to *Caillouet, v. City of New Orleans*, 02-475 (La.App. 4 Cir. 11/26/02), 834 So.2d 521, a case they contend is substantially similar to the present case. We find otherwise and choose instead to first review Mr. Bernard's complaints and medical treatment. Initially, we note that in *Caillouet* the plaintiff had a left posterior herniated nucleus pulposus at L5–S1, and a lumbar discectomy and laminectomy was performed on the plaintiff. In the present case, not only did Mr. Bernard have surgery at a different level of the spine, L4-5, he was also diagnosed with posterior column symptoms, underwent steroidal injections, and suffered continued leg pain even post-surgery. Moreover, the plaintiff in *Caillouet* was awarded $200,000.00 for a 1989 injury and that award was not contested in the 2002 appellate decision. As an example of why recourse should not be first had to other jurisprudence, compare *Stewart v. Ice*, 07-871 (La.App. 4 Cir. 4/9/08), 982 So.2d 928, *writ denied*, 08-1000 (La. 8.29/08), 989 So.2d 101. In *Stewart*, a trial court awarded $350,000.00 in general damages for soft disc syndrome at L4-5, low back pain, and a right knee injury. Although there was no surgical intervention of the back and knee, the appellate court determined that the trial court was well within its discretion when it assessed general damages of $350,000.00.

for evaluation of continued neck and back pain. When conservative care and physical therapy did not yield positive results, Dr. Mack ordered various diagnostic tests. After reviewing diagnostic X-rays and an MRI, Dr. Mack referred Mr. Bernard to Dr. Sledge.

On June 16, 2014, about three months post-accident, Dr. Sledge examined Mr. Bernard and reviewed the diagnostic tests with him. At that time Mr. Bernard had persistent neck pain which Dr. Sledge diagnosed as posterior column symptoms. Regarding the pain in the lumbar spine and leg, Dr. Sledge determined Mr. Bernard had significant segmental disease at L4-5 with an annular tear and neural impingement. At that time, Mr. Bernard agreed to try injection therapy.

Mr. Bernard underwent a L4-5 right-sided facet injection and L4-5 transforaminal epidural steroid injections. After a period of approximately twelve weeks, Mr. Bernard returned to Dr. Sledge on September 12, 2014, having received no resolution of his back and leg pain after the injections. At that point, Mr. Bernard agreed to proceed with anterior lumbar interbody fusion and decompression surgery.[15] As reflected in the medical records, Mr. Bernard underwent that surgery on October 23, 2014.

Dr. Sledge saw Mr. Bernard post-operatively on October 29, 2014, November 7, 2014, December 17, 2014, January 26, 2015, April 6, 2015, and July 15, 2015. Commencing on November 16, 2015, Mr. Bernard also began treatment with Dr.

---

[15] As related by Dr. Sledge, a Pfannenstiel incision was made in the abdomen near the belly button and the intestines were moved off to the side to provide the surgeon with a clearer view and access to the spine and disc. Dr. Sledge then removed about eighty or ninety percent of the disc to relieve pressure from the nerve roots. Finally, he inserted a spacer in the disc space and filled the disc area with bone graft.

Hodges for physical therapy and pain management and that continued until March 16, 2016.

According to Dr. Sledge, up until the six-month mark post-surgery, "it took [Mr. Bernard] a little bit longer to improve than we would've expected[.]" When Dr. Sledge last saw Mr. Bernard on July 15, 2015, Mr. Bernard was still complaining of pain with occasional radiation of pain into the foot. Summarizing his last consultation, Dr. Sledge said, "[Mr. Bernard] was frustrated . . . that he wasn't better than he thought he was going to be and was still frustrated by his intermittent, though persistent, leg symptoms." Finally, Dr. Sledge opined that Mr. Bernard would continue to improve, but he would need ongoing medical attention for the rest of his life[16] to assess the integrity of the fusion and its effect on the adjacent levels of the spine.

Mindful that it is not the work of the appellate court to express what it would have awarded for general damages, we recall that much discretion is left to the jury in the assessment of such damages. Clearly, the jury was well within its discretion when it awarded $400,000.00 in general damages. Thus, we find no merit to the Defendants' contention that this award was abusively excessive.

*Denial of Mr. Bernard's Post-Trial Motions*

Mr. Bernard presented the trial court with three post-trial motions: a motion for new trial; a motion for judgment notwithstanding the verdict; and a motion for additur. The trial court denied each of these motions. We will examine Mr. Bernard's arguments as to each of his contentions.

*New Trial*

---

[16] Dr. Sledge said that Mr. Bernard would require an additional CT scan within twelve to eighteen months post-surgery, together with annual X-rays and an MRI every two to three years.

In his motion for new trial Mr. Bernard, relying on La.Code Civ.P. art. 1972(A)(1), contends that the trial court erred when it failed to grant his motion for new trial. Mr. Bernard argued in his motion for new trial that the jury ignored the stipulation regarding his claim for lost wages.

Louisiana Code of Civil Procedure Article 1972 (A)(1) states that a trial court should grant a new trial "[w]hen the verdict . . . appears clearly contrary to the law and the evidence." The standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. *Davis v. Wal-Mart Stores, Inc.*, 00-0445 (La. 11/28/00), 774 So.2d 84.

Earlier in this opinion we fully examined this very question about the purported wage loss stipulation and determined there was no merit to Mr. Bernard's argument. Succinctly stated, we determined the jury did not err in its understanding of the stipulation entered between Mr. Bernard and the Defendants. Considering that we have rejected the predicate relied upon by Mr. Bernard, we find the same analysis is dispositive of his contention that the trial court erred in its denial of his motion for new trial. Clearly, the trial court did not abuse its discretion when it denied this motion for new trial.

*Judgment Notwithstanding the Verdict*

Mr. Bernard next contends that the trial court erred when it denied his motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. In support of his motion for JNOV, Mr. Bernard hinged his argument on the contention that the jury improperly lowered its calculation of damages by lessening it by sixty percent, the comparative fault it assessed to Mr. Davis.

Louisiana Code of Civil Procedure Article 1811(F) provides that a motion for JNOV may be granted on the issue of liability, on the issue of damages, or both. The

32

Supreme Court set forth the standard for granting a JNOV in *Davis*, 774 So.2d 84, 89 (quotation omitted):

> A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.

Appellate courts use a two-part inquiry when reviewing the district court's determination to grant or deny a JNOV. *Hammons v. St. Paul*, 12-0346, 12-0347 (La. App. 4 Cir. 9/26/12), 101 So.3d 1006. "First, using the same criteria the trial court uses in deciding whether to grant JNOV, the appellate court must determine if the trial court erred." *Id*. Second, "[a]fter determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review." *Id*.

Once again, earlier in this opinion we thoroughly examined the question of whether the jury impermissibly lessened its assessment of damages by applying sixty percent fault assessed to Mr. Davis and reducing its awards correspondingly. At that time, we determined there was no merit to Mr. Bernard's attempt to impeach the jury verdict and that his contention was solely based upon speculation and suspicion. We find that same analysis is applicable to the trial court's denial of Mr. Bernard's motion for JNOV. The trial court properly applied the standard of review as to the jury verdict, and its rejection of the motion for JNOV was not manifestly erroneous.

*Additur*

In seeking additur, Mr. Bernard contended that the jury erred when it failed to award his wage loss claim between the minimum and maximum amounts which Dr. Rice calculated was a proper award for that item of damages. His argument in that regard is premised on his contention that the Defendants stipulated to such an amount.

Louisiana Code of Civil Procedure Article 1814 provides:

> If the trial court is of the opinion that the verdict is so excessive or inadequate that a new trial should be granted for that reason only, it may indicate to the party or his attorney within what time he may enter a remittitur or additur. This remittitur or additur is to be entered only with the consent of the plaintiff or the defendant as the case may be, as an alternative to a new trial, and is to be entered only if the issue of quantum is clearly and fairly separable from other issues in the case. If a remittitur or additur is entered, then the court shall reform the jury verdict or judgment in accordance therewith.

In *Temple v. State ex rel. Dep't of Transp. & Dev.*, 02-1977, p. 14 (La.App. 1 Cir. 6/27/03), 858 So.2d 569, 579-80, *writ denied*, 03-2116 (La. 11/7/03), 857 So.2d 501, the appellate court stated:

> A trial court *may* offer an additur if the court finds that the jury award was so inadequate that the jury abused its discretion and a new trial should be granted. La. C.C.P. art. 1814. Thus, the decision to offer an additur rests on whether the grant of a new trial would be proper. *Magee v. Pittman,* 98-1164, p. 18 (La.App. 1 Cir. 5/12/00), 761 So.2d 731, 746, *writ denied,* 2000-1694 (La. 9/22/00), 768 So.2d 31 and *writ denied,* 2000-1684 (La.9/22/00), 768 So.2d 602. However, an additur can be finally "entered only with the consent" of the non-moving, opposing party. La. C.C.P. art. 1814. If the opposing party rejects the additur, the new trial is held. *Accardo v. Cenac,* 97-2320, p. 7 (La.App. 1 Cir. 11/6/98), 722 So.2d 302, 306.
>
>> The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court

34

must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence.

*Davis v. Wal-Mart Stores, Inc.,*2000-0445, p. 10 (La.11/28/00), 774 So.2d 84, 93 (emphasis omitted), quoting *Gibson v. Bossier City General Hospital,* 594 So.2d 1332, 1336 (La.App. 2 Cir. 1991).

In other words, if the jury's award is within its range of discretion, an additur is not proper. *See Accardo*, 97-2320 at p. 9, 722 So.2d at 307. The appellate standard of review for the grant of a new trial on grounds involving the trial court's discretion is the same abuse of discretion standard. *Magee*, 98–1164 at p. 19, 761 So.2d at 746.

Once again, the jurisprudence is replete with the recognition that the standard for denying or granting an additur hinges on whether a new trial would have been proper. Only in those instances, in an effort to avoid a new trial, should an additur be offered by the trial court. *Magee*, 761 So.2d 731. As observed hereinabove, we have determined that the trial court did not abuse its discretion in the denial of Mr. Bernard's motion for new trial. Therefore, we find the trial court also did not abuse its discretion in choosing not to offer an additur.

## DISPOSITION

For the foregoing reasons, the judgment of the trial court is affirmed. Because the Defendants have filed an answer to the appeal, and we have found no merit to it, we order that each party bear their own costs.

**AFFIRMED.**